**GOSHEN IRRIGATION DISTRICT,**
a Wyoming Irrigation District,
Plaintiff,

v.

**PATHFINDER IRRIGATION DISTRICT, a Nebraska Irrigation District; Gering and Fort Laramie Irrigation District, a Nebraska Irrigation District; and Northport Irrigation District, a Nebraska Irrigation District, Plaintiff–Intervenors.**

v.

**United States of America; U.S. Department of Interior; U.S. Bureau of Reclamation; Manuel Lujan, Jr., Secretary of the Interior; C. Dale Duvall, Commissioner of Reclamation; and Kenneth C. Randolph, Acting Project Manager, North Platte River Projects Office, U.S. Bureau of Reclamation, Defendants,**

**Farmers Irrigation District, a public Corp.; Gering Irrigation District, a public Corp.; Chimney Rock Irrigation District, a public Corp.; and Lingle Water Users Association, a public Corp., Defendants–Intervenors.**

No. 89–CV–161–J.

United States District Court,
D. Wyoming.

June 24, 1999.

Kim D. Cannon, Davis & Cannon, Sheridan, WY, Kate M. Fox, Davis & Cannon, Cheyenne, WY, for Goshen Irrigation District, a Wyoming Irrigation District, plaintiff.

John A. Sundahl, Sundahl Powers Kapp & Martin, Cheyenne, WY, Steven C. Smith, Van Steenberg Chaloupka Mullin, Holyoke Pahlke Smith, Scottsbluff, NE, for Pathfinder Irrigation District, a Nebraska Irrigation Dist., Gering and Fort Laramie Irrigation Dist., Northport Irrigation Dist., intervenors.

Clark G. Nichols, Nichols Douglas & Kelly, Scottsbluff, NE, Kermit C. Brown, Brown Nagel Waters & Hiser, Rawlins, WY, for Farmers Irrigation District, a Public Corporation, Gering Irrigation

Dist., Chimney Rock Irrigation Dist., intervenors.

Keith G. Kautz, Sawyer & Warren, Torrington, WY, Brian B. Wells, Sigler and Smith Law Office, Torrington, WY, for Lingle Water Users Association, intervenor.

Carol A. Statkus, Asst. U.S. Atty., U.S. Attorney's Office, Cheyenne, WY, Vincent J. Horn, Jr., Littleton, CO, for United States of America, United States Department of Interior, Bureau of Reclamation, Manual Lujan, Jr., C. Dale Duvall, defendants.

Donald Mark Gerstein, Wyoming Attorney General, Cheyenne, WY, for State of Wyoming, amicus.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALAN B. JOHNSON, Chief Judge.

### I

Water is the life-blood of Wyoming and Nebraska, arid Western states. Consequently, they, like the rest of the West, were transformed by the Bureau of Reclamation's epic water storage projects. The question raised in this case is whether the irrigation districts of the Bureau's North Platte River Project have priority to the use of water stored in Pathfinder Reservoir in a drought year.

The drought year in question is 1989. The water rights in question arise under contracts for water stored in reservoirs built by the federal government along the North Platte River pursuant to the Reclamation Act. The contracts are between the federal government and the plaintiff Goshen Irrigation District (GID) and intervening plaintiffs (collectively the government districts) on one hand and between the Bureau and the intervening defendants (the Warren Act contractors) on the other hand. The lands irrigated by the irrigation districts are in Wyoming and Nebraska. The question that divides the parties

arises only in drought, or short water years because then there is not enough stored water to provide the full amount of water the federal government, through the Bureau of Reclamation (Bureau), has contracted to deliver to all the parties.

The government districts acknowledge their contracts provide that in short water years the Bureau will divide the stored water pro rata among themselves. However, they contend that the Bureau exceeded its authority and breached its contracts with them when it included Warren Act contractors in the category of districts among which the insufficient water is to be divided. According to the government districts, their rights to the stored water have priority over the rights granted to the intervening defendants pursuant to Warren Act contracts.

The Bureau, the Department of the Interior, the United States and their named officials (collectively the federal defendants) contend that the contracts for stored water, government district contracts and Warren Act contracts alike, are ambiguous and therefore must be construed according to the understanding of the parties. According to the federal defendants, the understanding of the parties is that the Warren Act defendants are part of the North Platte Project with rights to the storage water of an equal footing to the rights of the government districts. The federal defendants also contend that the Bureau has the authority to make the disputed allocation.

The Warren Act contractors echo the position of the federal defendants, and, in addition, raise the affirmative defenses of waiver, estoppel and laches.

The court finds in favor of the government districts. The contracts are not ambiguous, the contracts provide the government districts with a first right to use the storage water, the government districts did not lose their first right by operation of estoppel, waiver or laches and the Bureau violated the government districts'

contracts by the way it allocated storage water in 1989.

## II  Background

A brief review of the Bureau's North Platte Project and its topography is described in the case *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945), and is helpful as general orientation:

> The North Platte River rises in Northern Colorado in the mountainous region known as North Park. It proceeds in a northerly direction on the east side of the Continental Divide, enters Wyoming west of Cheyenne, and continues in a northerly direction to the vicinity of Casper. There it turns east across the Great Plains and proceeds easterly and southerly into and across Nebraska. About 40 miles west of the Nebraska line it is joined by the Laramie River. At North Platte, Nebraska, it is joined by the South Platte, forming the Platte River. It empties into the Missouri River at Plattsmouth, near the western border of Iowa. In North Park it is a rapid mountain stream. In eastern Wyoming it gradually broadens out, losing velocity. In western and central Nebraska its channel ranges from 3000 to 6000 feet; it frequently divides into small channels; and in times of low water is lost in the deep sands of its bed. Here it is sometimes characterized as a river "two miles wide and one inch deep."

> There are six natural sections of the river basin: ... (3) Pathfinder Reservoir to Whalen, Wyoming which is 42 miles from the Nebraska line; (4) Whalen, Wyoming to the Tri–State Dam in Nebraska near the Wyoming–Nebraska line; ...

> \*      \*      \*      \*      \*      \*

> The river basin in Colorado and Wyoming is arid, irrigation being generally indispensable to agriculture. Western Nebraska is partly arid and partly semi-arid. Irrigation is indispensable to the kind of agriculture established there.

> \*      \*      \*      \*      \*      \*

> Irrigation in the river basin began about 1865, when some projects were started in eastern Wyoming and western Nebraska. Between 1880 and 1890 irrigation began on a large scale. Until 1909 storage of water was negligible, irrigation being effected by direct diversions and use. Prior to 1909 the development in Colorado and Wyoming was relatively more rapid than in Nebraska. Since 1910 the acreage under irrigation in Colorado increased about 14 per cent, that of Wyoming 31 per cent, and that of Nebraska about 100 per cent. The large increase in Nebraska is mainly attributable to the use of storage water from the Pathfinder Reservoir.

> \*      \*      \*      \*      \*      \*

> The Pathfinder Reservoir is part of the "North Platte Project" which followed the adoption by Congress in 1902 of the Reclamation Act. 32 Stat. 388, 43 U.S.C.A. §§ 372, 373, 381, 383, 391, et seq. Pathfinder was completed in 1913. *It has a capacity of 1,045,000 acre feet,* which is 79 per cent of the average annual run-off of the North Platte River at that point. This project includes an auxiliary channel reservoir called Guernsey, located above Whalen, Wyoming. Its capacity is 50,870 acre feet. The project also includes two small reservoirs in Nebraska—Lake Alice and Lake Minatare—having a capacity of 11,400 and 67,000 acre feet respectively. There are two main supply canals—Interstate and Fort Laramie—which take out from the North Platte at the Whalen diversion dam. *The Interstate canal runs on the north side and the Fort Laramie on the south side of the river.* Both extend far into Nebraska. *Northport—a third canal—is located wholly in Nebraska.* These canals and their laterals extend over 1600 miles. The project also includes a drainage system and two hydroelectric power plants. *The United*

*States contracted with landowners or irrigation districts for use of the water—selling it, as contemplated by the Reclamation Act, so as to recoup the cost of the project which was about $19,000,000. It also entered into so-called Warren Act contracts pursuant to the Act known by that name (36 Stat. 925, 43 U.S.C.A. § 523 et seq.) which authorized the Secretary of the Interior to contract for the storage and delivery of any surplus water conserved by any reclamation project in excess of the requirements of the project.*

We have mentioned the Interstate, Ft. Laramie, and Northport canals which are part of the North Platte Project, the first two of which take out at the Whalen diversion dam. About a mile east of the Wyoming–Nebraska line is the Tri–State Dam. Just above that dam in Nebraska are the headgates of three large Nebraska canals—Tri–State, Gering, and Northport. Water for the Northport is diverted through the Tri–State headgate, Northport physically being an extension of the Tri–State canal. Another Nebraska canal is the Ramshorn which also receives its supply through Tri–State. Just above the state line is the headgate of the Mitchell canal serving Nebraska land. While these five canals are commonly referred to as the Nebraska State Line Canals, this opinion generally uses the term as excluding Northport which, as we have said, is a North Platte Project canal. There are also nine Wyoming private canals diverting below Whalen. One of these, French Canal, serves lands in both Wyoming and Nebraska. The section of the river from Whalen to the Tri–State Dam is the pivotal section of the entire river. In this short stretch of 40 odd miles is concentrated a demand for water as great as in the entire preceding 415 miles apart from the Kendrick project to which we will refer. We will return to a consideration of the problems of this pivotal section shortly.

The North Platte Project has greatly increased the water resources of the river available for irrigation. Unused and wasted water are stored and held over from one season to another. Moreover, the storage water has affected the water tables through saturation of the subsoil. This has increased the return flows available for rediversion and irrigation.... And as we have already said, the great and disproportionate increase in acreage irrigated in Nebraska since 1910 as compared with the increase in Colorado and Wyoming is largely attributable to the North Platte Project. While the North Platte Project has increased the water resources, it has complicated the problem of water administration in Wyoming and Nebraska. It has necessitated a segregation of storage and natural flow. *The storage plants and diversion works are in Wyoming, although much of the beneficial use is in Nebraska.* Appropriators in Nebraska are dependent on regulation and control in Wyoming.

325 U.S. at 592–598, 65 S.Ct. 1332 (footnotes omitted and underlined emphasis added). *See also* 6 Waters and Water Rights, Subpart A. River Basin Surveys, 151 through 182 (overview of entire Missouri River Basin which includes the North Platte River).

### III   Findings of Fact

This matter was tried to the court sitting without a jury on April 23, 24, 25, 26, and May 24, 1990. The record includes the testimony and exhibits from the July 3, 1989, hearing on the temporary restraining order.

On March 14, 1903, pursuant to the Reclamation Act of 1902, the Secretary of the Interior authorized the North Platte Project for the construction of storage dams, diversion dams, and distribution facilities on the North Platte River to reclaim certain public and private lands within the North Platte River Valley.

On December 6, 1904, the Bureau filed an application with the State of Wyoming for a permit to construct Pathfinder Reservoir. Attached to the application was a general statement describing the plan for irrigation and development within the North Platte River Valley downstream of Pathfinder Dam. The general statement described plans for a number of proposed government-constructed canals, including the Interstate Canal. Under Bureau policies, canals and other works would not be constructed until the Bureau determined their feasibility.

The Bureau started construction on Pathfinder Reservoir in 1905. The same year it began construction of the Interstate Canal. The first irrigation deliveries from the Interstate Canal were made in 1908.

In 1909, D.C. Henny, a consulting engineer, prepared a report entitled, "Report on the Irrigation Uses of Pathfinder Reservoir" for the Bureau. Ex. 67. The Henny Report estimated that 600,000 acre-feet of water was the minimum amount that would be available from Pathfinder. *Id.* at 81.

Pathfinder's supply of storage water was considered in excess of what was estimated to be necessary for the planned government projects under the Reclamation Act. In other projects undertaken by the Bureau during this same time, estimates also showed that some of the reservoirs and other works could store and supply more water than the Bureau estimated was the maximum amount needed to supply government project lands under the Reclamation Act. The Warren Act was enacted on February 21, 1911, to allow the sale of any such storage water in excess of what would be required by the government project lands.

The Warren Act expressly provided that the sale of stored water "in excess of the requirements of the lands to be irrigated under any project" could be sold. 43 U.S.C. § 523. However, the Warren Act required that in such a sale the Secretary of the Interior must preserve "a first right to lands and entrymen under the project." *Id.*

On July 24, 1911, the Board of Engineers for the North Platte Project estimated Pathfinder's excess of what would be required by the government project lands as follows:

> The land included in the North Platte Project under the Interstate Canal will require about 200,000 acre feet of water from the Pathfinder Reservoir. Contract is now pending for the sale of rights for 40,000 acre feet more to the North Platte Valley Irrigation Company for irrigating a Carey [Act] segment above Douglas, Wyoming.
>
> According to the best available data, it is safe to say that there will be an additional amount of stored water available each year of at least 360,000 acre feet. *Of this amount 240,000 acre feet will be required for the Fort Laramie Canal project if built in accordance with the recommendation of the Army Board, leaving 120,000 acre feet available each year, the right to which may be otherwise disposed of to existing canals* which have flood rights prior to those of the Interstate Canal but which are in ordinary years short of water during the months of July, August and September.

Ex. 73 (underlined emphasis added).

The Board also recommended that an announcement of the availability of surplus storage water for sale be made as soon as possible. *Id.* This July 24, 1911, report was signed by the following officials of the North Platte Project: A.P. Davis [1], Chief Engineer; Mr. Henny, Consulting Engineer; R.F. Walter, Supervising Engineer; and Andrew Weiss, Project Engineer.

1. Mr. Davis was also the Director of the North Platte Project. In order to avoid confusion with the Director of Bureau of Reclamation, F.H. Newell, Mr. Davis will be referred to herein, as in most of the exhibits, solely by his title as Chief Engineer.

On August 4, 1911, Secretary of the Interior, Walter L. Fisher and Director of the U.S. Reclamation Service, F.H. Newell, attended a public meeting of the North Platte Valley Water User Association and various committees representing irrigation interests of the North Platte Valley held in Mitchell, Nebraska. The existing older irrigation companies, commonly referred to as the "old ditches" were represented by F.A. Wright. Ex. 74 at 14. Persons who supported the completion of the divisions on the south side of the river spoke in favor of such completion. *Id.* at 8–11. Secretary Fisher inquired about public feeling on the building of the proposed projects on the south side of the river, to be served by the proposed Fort Laramie Canal. He was assured by the Chairman that public sentiment was distinctly in favor of it. *Id.* at 11. Mr. Wright explained that the older irrigation project's natural flow rights were insufficient because they were not available when water was most needed. He stated the position of the older ditch companies in the following excerpts from the meeting report. Although lengthy, it will be repeated here because the federal defendants and the intervening defendants rely heavily upon remarks attributed to the Secretary of the Interior and to Mr. Newell.

Mr. Wright: ... We appreciate the fact that the lands under the Government ditch should have a prior right to the reservoir. [W]e respectfully ask the opportunity to come and purchase, subject to prior rights, this reservoir right of water that may possibly be standing there and going to waste.

\* \* \* \* \* \*

THE SECRETARY: Let me see if I can get a little nearer the issue in question. What sort of contract do you want to make with the government? A contract under which by a lump sum you will purchase an interest in the surplus waters, *subject to the prior right of the settlers under the government canal?*

Mr. Wright: We assume that would be in the discretion of the Secretary. If the payment of a lump sum would be necessary, we would do that, of course. We would prefer it if these payments could be made in installments....

\* \* \* \* \* \*

THE SECRETARY: But even if you do fix a sum, *you would recognize the right of the entrymen of the Government ditch to a prior right in the event of a shortage of water?*

Mr. Wright: Yes sir.

THE SECRETARY: It would be your suggestion that you would concede that point if it were raised?

Mr. Wright: Yes, sir.

THE SECRETARY: I have heard some discussion of this matter this morning. One of the questions raised is what would be the situation of the present settlers *or those coming in under the Government canal* as compared with those holding land under the old ditches, if in the future there should be an actual shortage of water due to any causes, which would greatly reduce the quantity of water in the Pathfinder reservoir, and there would not be sufficient [water] for all. *Under those circumstances, you recognize you would probably have to concede the prior right of those under the Government canal. This seems to be the purpose of the law.*

The object you have in mind in favoring a fixed sum is that *you would get a real vested right, subject to the vested right of those under the Government canal.* Of course, the possibility of such an emergency arising is to some extent affected by the question already raised—the construction of the canals on the other side of the river, particularly the High Line canal. The question as to what would be your position as to the priority of right in the event that the Government developed the land on that side of the river is of importance.

Mr. Wright: In regard to that I take it that the Government knows better than any one else as to what the probabilities are and as to whether they were selling us anything of value or not. If the reservoir supply of water is taken up—that is a matter that the Government would be able to determine and regulate. I would assume that the position of the Department would be not to do anything intentionally that would bring hardship upon any one.

THE SECRETARY: That is one of the serious questions on the south side. It would be a very serious thing if the government should establish a project and invite settlers to take up the lands and build their homes, and there was liability of being a shortage of water.

*I must say frankly that I concur in the general proposition stated—that the existing settler on the ground, even though he may not have come in under a government canal, but coming under a private enterprise, if they are willing to do what is fair and reasonable, is entitled to a priority of right over an unknown settler who has not got here yere* [sic].

(Unanimous and hearty applause).

That seems to have a struck a responsive chord. I may say in this connection that I appreciate very much the very frank and candid way in which you gentlemen are treating this matter....

\*      \*      \*      \*      \*      \*

THE SECRETARY: In this matter, it will be far more appropriate that you hear from Mr. Newell. He is the fountainhead of learning and wisdom in Reclamation matters.

Mr. Newell: This is exceedingly embarrassing to a man who is learning every day some of these things....

Of course, while we have the law defining many things, it makes the Secretary of the Interior really the man who determines most of the questions of practice. His opinion guided and mould-ed by the officials of the service under him governs to a very large extent the practicability of the law.

*The expression of the Secretary that the man on the ground is entitled to priority over the unknown settler who has not yet got here is to me one of the most valuable things of this visit.* This alone I think would pay for the trouble and expense of making the trip, because it is in full accord with the correct theory of the law, namely, that while we are to reclaim public lands, it is particularly the reclamation of arid lands. That principle we have adhered to quite closely. If we can adopt that principle unqualifiedly we should undoubtedly be guided in distributing the water at Pathfinder otherwise that if we should give preference to the man who has yet to come on the ground. The man who has come here should have ample water not merely to plant his crops but to get the very best results out of the land which he is using. I might talk on very indefinitely. But I am here to learn and to listen to the questions you have to present.

This forenoon one of the gentlemen asked as to *what the situation would be in case water supply would not be sufficient to fill the reservoir and furnish water to the old ditches along the river.* I have had them in mind. What is the minimum annual storage of the Reservoir?

Mr. Weiss: It would be 600,000 acre feet.

Mr. Newell: We find that Pathfinder is safe for 600,000 acre feet. We have extreme years—and years of drought.... We would be reasonably safe in disposing of 600,000 acre feet as a minimum. *Of this amount 250,000 belongs to this Project, and under the terms of the law, this project has a prior right.* I think possibly it will be well to read from the so-called Warren Act:

That whenever .... preserving a first right to lands and entrymen under the

project, (those words were put in by Congressman Kinkaid [2]—*I do not know just why* —I suppose because you kept the wires hot and got what you wanted) is hereby authorized, upon such terms as he may determine to be just and equitable, to contract for the impounding storage, and carriage of water to an extent not exceeding such excess capacity with irrigation systems operating under the Act of August eighteenth, eighteen hundred and ninety-four, known as the Carey Act, and individuals and, corporations, associations, and irrigation districts organized for or engaged in furnishing or. in distributing water for irrigation.[3] ...

Ex. 74 at 17–32 (underlined emphasis and footnote added)

On October 9, 1911, the North Platte Project's Supervising Engineer Walter wrote to Chief Engineer Davis in response to inquiries on the policy for sale of Pathfinder's surplus water.[4] Ex. 75. Mr. Walter opposed selling any of Pathfinder's excess water until the rights of the old ditches in Nebraska had been finally determined. *Id.* at 5.

However, there was pressure to go through with an immediate sale of surplus water because Tri–State (now Farmers) was in danger of financial failure due to a lawsuit between it and another private canal company. Ex. 77 (October 12, 1911, letter from Project Engineer Weiss to Supervising Engineer Walter). *See also* Ex. 99 p. 133 (explaining court decision in that lawsuit between non-government canal companies).

In a letter dated October 24, 1911, Chief Engineer Davis responded to Supervising Engineer Walter asserting there is not a good reason to wait to see how much water is determined to be necessary for the old ditches before announcing the sale of Pathfinder's excess stored water. He asserts:

> You seem to forget that the Departmental policy in this matter was carefully considered and decided by. Secretary Fisher last June. He decided that in handling the Pathfinder Reservoir, and in similar cases, preference should be given to lands already irrigated which require additional water supply, and that the irrigation of new lands should be secondary to their requirements.

> \* \* \* \* \* \*

> You will see by this that it is definitely decided by the Secretary of the Interior to give preference to the wants of the old irrigated lands and to plan future projects in such manner as to utilize *the surplus* after the old irrigated lands desiring stored water have had their supply completed....

Ex. 78 (underlined emphasis added).

Supervising Engineer Walter and Project Engineer Weiss responded on November 1, 1911, as follows:

> Our main reason for assuming the attitude we held heretofore is the wording of the socalled [sic] Warren Act, approved February 12, 1911, which reads in part as follows: "That whenever in carrying out the provision of the Reclamation law, storage or carrying capacity has been or may be provided in *excess of the requirements of the lands to be. irrigated under any project,* the Secretary of the Interior, preserving a first right to lands and entrymen under the project, is hereby authorized ..."

> We have assumed that the Fort Laramie Canal like the Third Lateral District under the Interstate Canal is a part of the North Platte Project, particularly since the Army Board has approved the building of the Fort Laramie canal and

---

2. Moses Kinkaid was Nebraska's Congressman.

3. Mr. Newell is reading section 1 of the Warren Act.

4. Although lengthy, these letters are reproduced in order to discuss intervening defendants' contention that they show the intent of parties to the Warren Act contracts.

recommended that $3,000,000 be set aside for this purpose, and that water could only be sold in excess of the requirements of the project including thereby these extensions. If we are in error in our understanding of this law there is no further question in our minds as to the better wisdom of adopting the present Departmental policy of offering to sell permanent storage rights to ditches now in operation *within the extent of the present apparent excess* reservoir capacity..... We agree that the sooner this offer is announced the earlier this period of water sales may be closed, and that in pursuance of this policy we should know the aggregate of these applications to purchase Pathfinder water before the construction of the Fort Laramie extension is authorized. As a matter of fact we favor the pursuit of this policy, *providing it does not conflict with the Warren Act....*

Ex. 79 (underlined emphasis in original and italics added).

On November 3, 1911, Chief Engineer Davis wrote again to Project Engineer Weiss:

Is it your idea that possibly we may decide not to sell any water rights: If so, we must get the Secretary of the Interior to reverse the ruling on this point. He has already decided that he will give preference to old water users who desire to protect their rights, rather than dedicate the Pathfinder Reservoir to new lands for which no ditches are yet built....

\* \* \* \* \* \*

It is *my* idea that the projects on the south side of the river should be so outlined as to, as nearly as possible, fit the water supply after the demands of all of the ditches have been met.

Ex. 80 (underlined emphasis added).

On November 4, 1911, Chief Engineer Davis wrote to Supervising Engineer Walter:

I have your letter of November 1 in which Mr. Weiss joins you regarding the policy of selling rights in the Pathfinder Reservoir, and I note that the differences grew out of your impression that *the policy I favor* was contrary to the Warren Act. I have talked this matter over with Mr. Bien and he thinks there is no doubt that policy outlined is entirely legal and that the Warren Act does not intend to give future work preference over the demands of older appropriators, but merely to protect Reclamation projects which have already acquired rights....

The Secretary did make definite decision after discussion and full consideration with Mr. Newell and myself that older appropriators desiring to purchase stored waters should have the preference over any new projects. The wisdom of this is all the more apparent when we are considering such expensive projects as those on the south side of the North Platte which *in my opinion* should be finally modified to fit the water supply after the old rights have been satisfied.

Ex. 81 (underlined emphasis added).

Secretary of the Interior Fisher announced the Bureau's policy for the sale of excess or surplus water from Reclamation projects in the following letter dated November 6, 1911:

The Director of Reclamation Services.

Sir:

I have considered the question of the disposal under Act [of] February 21, 1911 (36 Stat. 925) of *surplus waters* stored in Government reservoirs. *Subject to the limitations imposed by said statute,* such disposal should be governed by the following principles:

Water from Government reservoirs built for the irrigation of arid lands under the Reclamation Act, *where any surplus is available will, as a general rule be used to supplement the supply for lands already under irrigation, which supply must otherwise remain deficient,*

*rather than used to enlarge the area of the Government project by bringing into it lands as yet not irrigated. This general principle is not to prevail over local conditions and circumstances which may make the opposite course seem wiser in any particular case,* nor to be so applied as to encourage or permit the non-Government projects requesting the use of water from Government reservoirs to extend their own areas in such manner as may threaten a new deficiency in their supply. Such non-government projects should contribute to the cost of storage and delivery upon an equitable basis.

Ex. 273 (underlined emphasis added). *See also* Ex. 20.

This November 6, 1911, letter refers to the sale of the surplus water only and applies to all of the Bureau's Reclamation Act projects and not just to the North Platte Project. The court finds that the November 11, 1911, letter does not set the priority to be afforded to the water rights to be sold differently from or in addition to that provided in the Warren Act. Instead, the November 11, 1911, letter announcement refers specifically to the express language of the Warren Act: "Subject to the limitations imposed by said act." The Secretary's public announcement does not contain any reference to the so-called policy favored by Chief Engineer Davis whereby the size of the yet-to-be developed government project would be determined by the amount of the water left after the old ditches purchased all they wanted. Instead, the Secretary's policy is limited to the purchase of "excess water," i.e. water in excess of that then-estimated as reserved for the entire government project.

On December 12, 1911, the Bureau issued another public letter regarding the sale of Pathfinder's surplus, this one signed by Mr. Newell as Director

Washington D.C. December 12, 1911

Office of the Director

Supervising Engineer

Reclamation Service

Denver, Colo.

Dear Sir:

On November 6, 1911, the Secretary of the Interior announced his policy regarding the disposal of surplus waters stored in Government reservoirs as authorized by the Act of Febr. 21, 1911 (36 Stat., 925)

In accordance therewith and in view of the fact that *the development of the North Platte Project as now contemplated will leave a surplus of water* in the Pathfinder reservoir and as there are in the North Platte Valley in Nebraska *certain lands already under irrigation,* the water supply of which is now deficient, you are hereby authorized to announce by authority of the Secretary of the Interior that, until further notice, contracts will be made with the owners of irrigation systems in the North Platte Valley in Nebraska, under the provisions of the Act of February 21, 1911, (36 Stat., 925), for the delivery of water from Pathfinder reservoir at the point where the North Platte crosses the Nebraska state line, to the extent of the amount available in excess of the requirements of the lands *to be* irrigated under the North Platte Project, at a charge of $5.00 per acre-foot, payable upon the following terms ... In addition, payment shall be made of the charges for operation and maintenance connected with the storage of the water and the care and control thereof between Pathfinder dam and the point of delivery, as assessed annually by the Secretary of the Interior. *Such contracts shall incorporate the necessary requirements set forth in the said act.*

In order that the requirements for the season of 1912 may be definitely provided for and in consideration of the time which will be required to formulate the contract, it is important that application shall be made on or before March 1, 1912, in order to insure delivery of such

surplus water in the irrigation season of 1912.

Arrangements have been made for furnishing surplus water in Wyoming by contract with the only irrigation system thus far applying for the delivery of water in that state. Other applications in Wyoming will be considered upon substantially the same basis as herein announced.

Very respectfully,

(Sgd.) F.W. Newell,

Director [of the U.S. Reclamation Service]

Ex. 275 and Ex. 85.

This December 12, 1911, public announcement from the Secretary differs from Mr. Newell's earlier intra-agency correspondence in that it does not incorporate Mr. Newell's idea of limiting the scope of new projects by designing them to fit the water that would be left after the old ditches were fully supplied. Instead, the announcement expressly discusses the surplus available for purchase as that not needed for the North Platte Project as "now" contemplated for the lands "to be" irrigated.

The position of the Secretary of the Interior and of the Bureau regarding sales under the Warren Act was laid out in the letters of November 6, 1911, December 12, 1911 and February 3, 1912.[5] Ex. 89 and 90.

Tri–State, soon to be renamed Farmers Irrigation District, was involved in protracted negotiations with the Bureau for the purchase of stored water from before the announcement through August 1912 when Tri–State's Warren Act contract was signed. See Ex. 1 (Tri–State's Warren Act contract). Among matters debated during the Tri–State negotiations were the issues of any restrictions on the use of the water purchased under the Warren Act and a question of the extent of their pre-existing water rights. See Ex. 111.

The negotiations reveal that a major concern was whether the Warren Act contracts would limit the use of the purchased storage water to land that had already been irrigated, or if the Warren Act contractor could use the water for land that was "under" or "covered" by these old ditches but which had not yet been irrigated. See e.g. Exs. 88, 89, 97, 107, 118, 120, and Ex. 90 (referring to policy as set forth in Ex. 89).

In an April 27, 1912, Report, Project Engineer Weiss reported to the Consulting Board that there had been little activity in making applications for the Pathfinder water under the Warren Act "due in large measure to the restrictions which the Warren Act imposes upon these sales. These restrictions work in many cases a distinct hardship." Ex. 98 at 127.

It was the position of Board of Consulting Engineers for the project that Warren Act contractors should be allowed to use their purchased stored water to irrigate any land in their districts, and not be limited to lands previously irrigated. Ex. 99 (May 3, 1912 Report on the Sale of Pathfinder Water by Board of Engineers). The Board of Engineers opined that such a sale of surplus water to "actual settlers" on lands reached by, but not yet irrigated under, the "old canals" "would not in any way jeopardize the water supply of the Fort Laramie Canal on the south side of the River even if it should be extended to cover an area of 125,000 acres as now appears possible." Ex. 99 at 141.

Tri–State enlisted the support of Nebraska's Governor and others to lobby the Secretary of the Interior to allow Tri–State to use its Warren Act water on lands "covered" by Tri–State, but then-unirrigated. See Ex. 97.

In April 1912, the Secretary of the Interior responded to what was apparently an orchestrated campaign to soften the Bureau's position. He began his response

5. The letter of February 3, 1912, is not part of the record.

with the following April 8, 1912, telegram to the Governor of Nebraska:

> To Hon. Chester H. Aldrich,
>
> Governor, Lincoln, Nebraska.
>
> Do not feel justified on present information in approving contract to sell at cost Government water for land not heretofore under irrigation when the facts concerning which are not fully before the Department. Many canals built for land speculation have been extended far beyond available water supply. *Government water should be used to protect actual settlers and those waiting only on water to become such.* On this principle have authorized Reclamation Service to approve pending North Platte contracts *for water needed by all lands heretofore irrigated* and have told applicants that contract would be extended on proper showing as to remaining lands. This has not been furnished and telegraphic insistence by them or their friends cannot be accepted as a substitute for information.

Ex. 282.

Thus, as the telegram clearly shows, the Secretary's statements relating to the excess water being used to protect "actual settlers on the ground and those waiting to become such" relates to the debate over the old ditch companies' desires to be able to use their Warren Act water purchases for previously unirrigated lands in their districts. *See* Exs. 212 and 213 for 1910 discussion of problem of settlers waiting for water.

The Secretary reiterated this response in letters to various Nebraska officials and irrigation districts, including Congressman Kinkaid on April 16, 1912: "No action has been taken with regard to the furnishing of such *surplus water for use upon lands not heretofore irrigated,* but applicants for the purchase of water for use upon such lands have been required to furnish information in detail with respect to such lands. Until such information is furnished no action will be taken upon the applications." Ex. 120 (underlined emphasis added).

These communications were collected in a policy memorandum dated June 4, 1912 and entitled: "Memorandum regarding policy of the Secretary of the Interior for the disposal of *surplus* stored water from the Pathfinder Reservoir *in regard to lands not previously irrigated.*" Ex. 120 (underlined emphasis added). Significantly, the policy memorandum on the sale of water in regard to lands not previously irrigated begins with the entire text of the Secretary's November 6, 1911, announcement.

Read together, the entire series of communications from the Secretary of the Interior on the subject of surplus stored water in regard to lands not previously irrigated makes it clear that what he was referring to when he spoke, and later wrote, of "actual settlers on the ground" were persons who under the old ditches had already irrigated their lands but needed a seasonal supplement. Similarly, when he spoke of "those waiting for water to become such" he was referring to settlers who had actually purchased farms in the old ditch districts with the hope of eventually having government water.

This was the understanding of the Bureau during its negotiations for the Warren Act contracts involved in this case as is evidenced by Director of Reclamation Newell's March 19, 1912 letter explaining his understanding of the Secretary of the Interior's and the Bureau of Reclamation's policy in a letter to Chief Engineer Davis:

> Mr. C.N. Wright, President of Tri–State Canal Company has been to see Secretary Adams with reference to purchasing water under the terms of the Warren act. He has found that the form of the contract presented to him narrowly limits the water which may be purchased and that, therefore, he is unable to negotiate for a loan needed by his company.
>
> \* \* \* \* \* \*

The clause which Mr. Wright finds to interfere with his plan was prepared by Secretary Fisher with an understanding with Senator Warren [6] by which he would not sell to the lands in Nebraska the waters which Senator Warren claimed were needed elsewhere.

[T]he details have been discussed between Secretary Fisher and First Assistant Secretary Adams, and he is not willing to recede from the position taken, although he might possibly modify it in individual cases.

The general theory is that water may be sold to individuals who have gone on in good faith attempting to develop their farms, who have built their lateral ditches or have paid for a water right which turns out to be inadequate. These men should be assisted, if possible, by selling the necessary amount of water needed for the cultivation of their fields.

On the other hand, the Secretary is not at all concerned to help out the canal companies who have built or propose to build canals and laterals to cover lands which have not yet been developed in whole or part by individuals, that is to say, the Secretary is not trying to make a profit for these canal companies or to save them from an unprofitable investment.

In the case of the individual farmer who has purchased land and water rights, it is presumable that he did not have and could not obtain full information, but in the case of a canal company selling water, there is every reason to assume that the men investing in or controlling the company are of sufficient intelligence to know the risks which have been assumed.

The general principles having been laid down by the Secretary in his letters of November 6, December 12, and February 3, 1912, it is now necessary for a determination in the field to be made as to the exact areas to which water may be sold. I told Secretary Adams that it is proposed to have a board meeting in the near future to consider the entire North Platte situation and make recommendations. It is presumed that this board will review the facts now available of total water supply, the legal rights which attach to it, so far as known, the amount needed for the completion of certain important essentials of our plans, and that then the question will be taken up of the disposal of the residual water which may be available.

In recommending the disposal of this, we should take into account the applications made for it, and apply the principles laid down as noted above, and make a list or describe in general terms the lands for which the stored water may be sold under the terms of the Warren Act.

As I understand the matter there are three or more classes of lands to be considered:

1. Those which have an adequate supply . . .

2. Those lands which have a partial supply. These are the ones which presumably are of most concern to us to ascertain as far as practicable what is the present supply and how much water should be sold to them.

3. The lands which are now under canals or laterals but which have never made application for water or have had it only on a rental basis. According to the strict interpretation of the principles laid down, we cannot sell water to these lands, but there may be some special consideration to be given to them, and recommendations from you, based on the ameliorating facts, may be considered.

4. Lands to which canals have not yet been extended, but where it is desired to build laterals largely on a speculative or commercial basis. Here we cannot consider the disposal of water unless possibly it might turn out that we

---

**6.** Francis E. Warren was Wyoming's senator and a sponsor of the Warren Act.

have an actual excess above all other needs.

In the above, I have tried to outline my understanding of the ideas of the Department. I wish that you would take this up in connection with the principles laid down and see whether I have made myself clear or whether there are other considerations which must be taken into account, calling my attention to these, so that I can take them up with the Department for further instructions . . .

Ex. 89 (March 19, 1912, letter to Chief Engineer Davis, with copies to Supervising Engineer Walter and Project Engineer Weiss) *See also* Ex. 222 (Supervising Engineer to Chief Engineer Davis stating his understanding that telegrams of April 8 and 13, 1912 modified the previous strict policy against selling stored water to "such lands as had heretofore irrigated and were under completed irrigation systems.").

Thus, the policy favoring "the existing settler on the ground" was the Interior Department's attempt to avoid Reclamation Act water's being used by the private ditch companies to extend water to lands in support of private land speculation. Similarly, the phrase "local conditions and circumstances which may make the opposite course seem wiser in any particular case allowing an opposite course" in the Interior Secretary's November 6, 1911, announcement refers to the possibility of Warren Act water's being used for previously unirrigated old ditch lands. This is why the local conditions exception is coupled in the same sentence with the caution that the old ditch companies would not be encouraged or permitted to use the water to extend their own areas in such a manner as to threaten a new deficiency. Thus, contrary to the positions of the defendants, the Interior Secretary's public statements regarding his "settlers on the ground" policy does not relate to the question of the relative priority between the government districts and the Warren Act contractors.

Instead, the "settlers on the ground" policy relates solely to the issue of the Warren Act contractors' ability to use their purchased storage water within their own districts for lands previously unirrigated.

Each of the Warren Act Districts entered into a contract or contracts with the United States through the Department of the Interior, United States Reclamation Service, now known as the Bureau of Reclamation, (the Bureau) for the use of the excess storage capacity in the Pathfinder Reservoir, pursuant to section 1 of the Warren Act, 43 U.S.C. § 523.

At the time the Warren Act contractors entered into their contracts with the Bureau, they also held various appropriated rights to the natural flow of the North Platte River as of the dates that follow:

| Farmers | 1887 and 1902 |
| Chimney Rock | 1890 |
| Gering | 1897 |
| Lingle | 1901 [7] |

Intervening defendant Chimney Rock Irrigation District is the successor in interest to the Chimney Rock Irrigation Canal and Water Power Company, one of the original Warren Act contractors. As noted above, Farmers Irrigation District is the successor in interest to Tri–State Irrigation, signer of the first North Platte Project Warren Act contract.

Except where noted the Warren Act contracts are, in relevant part, similar to each other and contain the following provisions, taken from Gering's contract:

THIS AGREEMENT, made and entered into this 17th day of January, 1913, in *pursuance of* the Act of Congress of June 17, 1902, (32 Stat., 388), known as *the Reclamation Act, and acts supplementary thereto and amendatory thereof, and in particular Section 1, of the Act of Congress approved February 21, 1911, (36 Stat., 925), known as the* "Warren Act," by and between the United States of America, acting in this behalf by Samuel Adams, First Asst., Section as Lingle.

7. Non-party Hill holds the same appropria-

retary of the Interior, hereinafter styled the "Secretary," thereunto duly authorized, and the Gering Irrigation District, a public corporation organized under the laws of the State of Nebraska, .... hereinafter styled the "District,"

WITNESSETH:

WHEREAS, in carrying out the provisions of the said Reclamation Act, the Secretary, being authorized by the said Warren Act, deems it advantageous upon the terms herein agreed upon to dispose of surplus storage rights in reservoirs constructed or to be constructed by the United States, under the provisions of the Reclamation Act in the basin of the North Platte River, and

Whereas, the United States has completed a reservoir on the North Platte River, known as the Pathfinder Reservoir, from which certain surplus storage waters are available for disposal under the terms of the Warren Act, and

Whereas, the District has constructed and operated a canal and distribution system for the irrigation of the lands of said District from the natural flow of the North Platte River and has perfected a right to the use of a portion of said natural flow, the said portion being insufficient for the proper irrigation of the said lands during the middle and latter part of the irrigation season, and

WHEREAS, the District is desirous of perfecting its water supply by arranging with the Secretary for the use of a portion of the said surplus storage waters,

NOW, THEREFORE for and in consideration of the mutual and dependent stipulations herein contained the parties hereto do covenant and agree as follows:

ARTICLE 1: *The United States will impound, and store water in the Pathfinder Reservoir, or elsewhere and re-lease the same into the North Platte River at such times and in sufficient quantities to deliver, and does hereby agree to deliver at the Wyoming–Nebraska State Line for the use of said District an amount of water which will....*

\* \* \* \* \* \*

ARTICLE 6. In consideration of said delivery of water the District agrees to pay to the United States the sum of One Hundred Thousand Dollars, ($100,000) in installments as follows:

\* \* \* \* \* \*

ARTICLE 7. In addition to the amounts above specified the District agrees to pay to the United States one-twentieth [8] part of such amounts as shall be fixed by the Secretary as total operation and maintenance charges in connection with the storage works from which said stored water may be supplied: ... Such operation and maintenance charges shall be payable in advance on April 1 for the current year.

\* \* \* \* \* \*

ARTICLE 9. *The United States shall not be liable for failure to supply water under this contract caused by* hostile diversion, *unusual drough [sic],* interruption of service made necessary by repairs, damages caused by floods, unlawful acts or unavoidable accidents.

\* \* \* \* \* \*

ARTICLE 11. It is further understood that the water users under *projects* of the United States Reclamation Service dependent for storage upon the said storage works *shall be prior to the District* and to water users therein in right to the use of stored waters from

---

8. The other Warren Act contracts at issue provide for payment of shares of the total operation and maintenance charges as follows: Farmers, one-fourth (Ex. 1 at 7); Chimney Rock, one-sixtieth (Ex. 9); and, Lingle, one-twenty-second (Ex. 14), plus one one-hundredth (Ex. 19), plus one five-thousandth (Ex. 20). The Warren Act contractors pay approximately 43% of the total operation and maintenance costs for Pathfinder Reservoir. Several Warren Act contractors who are not involved in this litigation also pay a share of the operation and maintenance. *See* Ex. F.

the said storage works *in accordance with Article 1 of the Warren Act.*

Ex. 7 (underlined emphasis added).

In addition to the same provisions above, the Tri–State/Farmers' Warren Act contract, the oldest Warren Act contract at issue, also provides:

> ARTICLE XIII—It is understood that the Secretary shall provide for the irrigation from the Pathfinder Reservoir of no greater area of land in the aggregate than can in his opinion be furnished with an adequate supply of water in all years of ordinary runoff.

Ex. 1; *see also* Ex. 137 at A307444 (adding this article to proposed contract).

The Tri–State/Farmer's contract also provides:

> The delivery of the water supply provided for in this contract will be accepted by the Company as in full satisfaction of all its rights to the water of the North Platte River, both natural flow and surplus storage from the Pathfinder Reservoir . . .

Ex. 1 at 8, Art. XI.[9]

On May 10, 1922, Lingle and the Bureau entered into a contract amending its July 1, 1915, Warren Act contract and its March 9, 1917, Warren Act contract to purchase additional stored water. Ex. 19. This May 10, 1922, contract is titled "Contract between the United States of America and Lingle Water Users' Association for Purchase of *Permanent* Storage Rights in Pathfinder Reservoir Under Warren Act." *Id.* (underlined emphasis added). It is the only Warren Act contract so titled. The provisions in Articles 16 and 18 of the May 10, 1922, contract are identical to the provisions of Articles 9 and 11 quoted above from Gering's Warren Act contract. There is no mention of "permanent" water in the body of Lingle's May 10, 1922, contract, nor is there any definition of the term.

On May 15, 1924, Lingle and the Bureau entered into another contract to purchase additional stored water titled "Contract dated May 15, 1924 for 133 [10] Additional Acre Feet of Water between United States of America and Lingle Water Users Association." Ex. 20. The May 15, 1924 contract contained the same clauses relative to no liability for the United States for the failure to provide water due to unusual drought and for a prior right for water users under projects of the Bureau as are contained in all of the other Warren Act contracts at issue.

Each of the Warren Act contracts provide for a specific quantity of water to be delivered. None of the Warren Act contracts provide authority for the Bureau or the Secretary to pro rate the contractual water or otherwise expressly provide for how Pathfinder Reservoir water would be, or could be, allocated during periods of shortage.

In a December 1914 Report, the Board of Engineers noted that a then-recent Nebraska Supreme Court case was, in effect, "a revival of an old [water] right" not previously taken into consideration in calculating available water. Ex. 170 at 2. The demands of that prior right, plus heavier than anticipated irrigation demands, resulted in the Board's opinion that there was less water available than previously thought and a suggestion that the Ft. Laramie division be reduced in acreage. *Id.* at 7. The Board also noted there would not be enough stored water to consider a Goshen Park unit, which unit had been estimated to be significantly more expensive than the Ft. Laramie unit. *Id.* at 8. As a result, the Board recommended that no more "surplus" water be sold to private ditches. *Id.* at 10.

However, a later, March 10, 1915, Report of the Board of Engineers estimated

---

9. This provision was subsequently at issue in the Eighth Circuit's 1941 *Tilley* decision.

10. Exhibit 20 has the number 76 crossed out and the number 133 written in by hand. Ex. 20.

that there was sufficient water for the planned Laramie Canal and the Bridge-port District. Ex. 176. The 1915 report concurred with the 1914 report that there was insufficient supply for the Goshen Park High Line project and concurred that those lands should be restored to entry. The 1915 report, like the majority of the Bureau's contemporaneous records, distinguishes the lands using water purchased under the Warren Act "Contract Canals" from the lands of the North Platte Project, whether already developed "North Platte Project" or soon to be developed "New Land." *Id.* at 306. The 1915 report tentatively concluded that there "may still remain a small margin for permanent disposal to private canal companies under the Warren Act. It is evident, however, that great caution must be exercised [and] that it may be wise to discontinue sales until the areas above mentioned shall have been more closely determined, and until more data accumulates as to increased return flow." *Id.* at 307.[11]

After the Warren Act contracts at issue in this case were signed, the Bureau approved the Ft. Laramie division and the Northport division of the North Platte Project. The Gering–Ft. Laramie canal was constructed south of the North Platte River and was completed about 1920.[12]

Goshen Hole High Line, a project originally planned in 1903–09, was not constructed because the topography would have made irrigation expensive and therefore impracticable. Ex. 232 at 3 and 6 (February 11, 1915 letter from District Counsel of Interior's Chief Counsel stating there had been no possibility of constructing Goshen Hole unit since the Board of Army Engineers 1910 report, which did not approve its construction). *See also* Ex. 201 (1905 report noting that Goshen

Hole project will be expensive and may not be feasible); Ex. 211 at 28–29 (1910 Army Board report). In addition, the Bureaus' actions in selling "excess" water before accurate data was compiled and before resolution of all disputes over claimed North Platte River appropriations were settled made the construction of an expensive project like Goshen Hole even more impracticable. The decision not to go ahead with Goshen Hole was not popular in Wyoming because of the perception that Wyoming water should be used to develop Wyoming lands instead of diverted to divisions lying inside of Nebraska's borders. *See* Ex. 278 (April 22, 1911 letter from Senator Warren to Secretary of Interior asking for information on Goshen Park units) and Ex. 279 (Secretary's noncommittal May 2, 1911, reply questioning whether there was enough water due to the amounts to be purchased under the Warren Act) and Ex. 180 (July 9, 1914 letter from Walter to Newell explaining numerous Wyoming residents disappointed that government did not build Goshen Park canal which would have irrigated more land in Wyoming than the Fort Laramie unit).

In 1922, the Bureau held a drawing at Torrington, Wyoming, to determine who would be allowed to make entry on government lands in the Ft. Laramie division. *See* Ex. 285 (July 14, 1921, Order announcing Ft. Laramie lands available for entry).

In 1926, irrigation districts were formed to contract with the United States on behalf of the landowners, creating rights and obligations as government districts under the North Platte Project pursuant to the Reclamation Act.

On November 24, 1926, plaintiff GID, an irrigation district organized under the laws of the state of Wyoming and based in

---

**11.** This is one of many similar expressions of concern by the officials in the field over contracting for "excess" storage water when there were pending disputes over the rights to the natural flow under Nebraska law and the status of claims under older appropriations as

well as uncertainty over measurements. *See e.g.* Exs. 75–81.

**12.** Pathfinder and Northport are north of the North Platte River and GID and Gering–Ft. Laramie are south of the river.

Torrington, Goshen County, Wyoming, entered into a contract with the United States, under which GID agreed to operate and maintain certain North Platte Project works and to collect money from landowners to repay the United States for the cost of the project. Complaint Ex. 1. The other government districts also entered into contracts with the Bureau in 1926. Northport's 1926 contract modified but otherwise retained its February 24, 1919 contract with the Bureau. Ex. 16. Gering and Ft. Laramie's 1926 contract modified but otherwise retained its May 25, 1920 contract with the Bureau. Ex. 10. Pathfinder's first contract with the government was in 1906. Ex. 68. Except where noted, GID's 1926 contract is representative of the contracts of the other government districts. GID's 1926 Contract provides:

*United States to Store Water for [GID]*

4. The United States will store for the irrigation of [GID's] lands in the Pathfinder reservoir or elsewhere and [GID] shall have a *perpetual* right to the annual combined supply of said stored water together with the natural flow of the North Platte River, as the same may be augmented by precipitation, percolation, seepage, return flow, developed and undeveloped waters, in the quantity annually needed for the irrigation of [GID's] lands, not, however, to exceed the quantity that can be beneficially used thereon, not to exceed one cubic foot per second for each seventy acres of land; *and in the event that the available water supply from the North Platte Project in any year shall be reduced as the result of natural conditions to a quantity less than is necessary for the adequate irrigation of all lands of said project, [GID], which is hereby recognized as a part of the North Platte project, shall be entitled to its own proportionate part, as determined by the relation between the irrigated area of [GID's lands] and the irrigable area of the entire North Platte project, and [GID] shall accept such proportionate*

*part in full satisfaction of its claim for water during such period of shortage.* The United States claims all waste, seepage, spring and percolation water arising within [GID's lands] and proposes to use such water upon lands in connection with the said project or water from the works thereof, and [GID] concedes such right and concurs in the said plan.

\*    \*    \*    \*    \*    \*

*Water for Nebraska Lands*

9. [GID] will carry for the United States in the transferred works (as hereinafter defined), such waters as the United States will furnish and require *for the irrigation of the lands of the Fort Laramie Division of the North Platte project* of the Bureau of Reclamation lying east of the Wyoming–Nebraska State line, as now constructed and will deliver the same to the United States at said State line in the main canal and laterals as now constructed: *Provided, however, that [GID] shall not be required to deliver to the United States hereunder an amount of water in excess of the equitable and ratable proportion of water to which such lands in Nebraska are entitled from the whole amount then available for delivery to the entire Fort Laramie Division, nor at a rate in excess of the equitable and ratable share of such Nebraska lands in the then available carrying capacity of the Fort Laramie canal. The decision of the Secretary as to the amount of water available, an equitable division thereof, and the division of available carrying capacity, shall be binding on all parties in interest.*

\*    \*    \*    \*    \*    \*

Carrying out Obligations of Contract

17. *The District shall perform and carry out in accordance with their true intent and meaning and to the satisfaction of the Secretary, all obligations imposed upon the United States in all contracts of whatever kind, affecting the*

*Wyoming portion of said Fort Laramie Division now in force,*[13] and shall not attempt in any manner to change the terms of said contracts. Insofar as is permitted by law and if not otherwise herein provided, *the District shall have all rights and privileges in and under all such contracts as the United States now has or would have* if this contract were not in effect.

\*   \*   \*   \*   \*   \*

### Claims and Complaints of Incorrect Distribution of Water

29. The United States and its agents in charge of the reserved works will use their best efforts and best judgment to deliver and turn out for the several parties entitled to receive water from said works their correct and proper share of the water actually available therefrom, and should the district, ... feel aggrieved on account of any alleged shortage in the water supply delivered by the United States hereunder, or on account of any alleged mistakes or inaccuracies in the division of the water among the parties entitled to receive water from said reserved works, such party shall at once report to the officer of the United States in charge of said reserved works such alleged shortage or error in the division or delivery of water, and such officer shall promptly investigate any such complaint and if he finds that the proper proportionate share of the available water supply to which such party is entitled is not being delivered for such party, he will correct the delivery insofar as the United States has control of such delivery and distribution, *so that the correct proportionate share as nearly as practicable to which such party is entitled will be delivered* ... If any such party is dissatisfied with the decision of such officer of the United States in

charge of the reserved works, such party may apply to the Secretary for an order for the correction of any alleged error in the delivery or diversion of water from said reserved works,[14] but *neither the United States nor its officers or agents shall be liable in damages on account of any such alleged shortage or mistake in the delivery or division of the water* from said reserved works.

\*   \*   \*   \*   \*   \*

### Operation and Maintenance Transferred

33. Effective ... there is hereby transferred to the District ... [illegible] of the North Platte Project, from which time the United States shall not be obligated to do any work in connection with the operation, maintenance or repair of the said Wyoming portion of said division. The works transferred are as follows:

(a) That portion of the main Fort Laramie Canal of the Fort Laramie Division extending from Station 12 to the Wyoming–Nebraska State Line.

(b) All lateral distributions, drainage channels, dams, dikes, protective works and structures constructed for the benefit of the lands of the District under said Fort Laramie Division of the project.

(c) All buildings in Wyoming used for operation purposes in connection with said Fort Laramie Division of the project, except those reserved ... No title to any of the works passes.

\*   \*   \*   \*   \*   \*

### District Accepts, Care, Operation and Maintenance

35. The district hereby accepts the care, operation and maintenance of the

---

13. Some of the government districts' contracts specifically enumerate, in nonexclusive lists, the contracts to which this section refers. *See* Northport's contract at ¶ 13 and Gering and Ft. Laramie's contract at ¶ 7

14. Gering and Ft. Laramie's contract does not contain this clause providing for an appeal for an alleged error. Complaint in Intervention Ex. 2.

transferred works, and at its own cost, and without cost to the United States, will care for, operate and maintain the same in full compliance with the said Reclamation law ..., the regulations of the Secretary ..., and the terms of this contract, *and any other contracts in force affecting the transferred works,* in such manner that said works shall remain in as good and efficient condition for diversion and distribution of irrigation waters as is now the case....

\* \* \* \* \* \*

Rights of Way for Drains, etc.

.... And the District may exercise any and all rights which the United States might exercise for the necessary construction and operation and maintenance of such ditches or canals....

Complaint, Ex. 1 (underlined emphasis added). In addition, the Contract provides for the United States to turn over certain equipment and supplies. *Id.* at ¶ 36.

Pathfinder's 1926 contract provides:

The District, shall carry out in accordance with their correct intent and meaning, and to the satisfaction of the Secretary, *all project contracts of whatsoever kind or nature now in force* ... affecting the transferred property in any manner and *shall fulfill all obligations imposed upon the United States therein.*

\* \* \* \* \* \*

The total amount which the District shall have the right to order from said reservoir from any irrigation season shall not exceed the proportionate share of water *actually available* from said reservoir to which the lands of the Interstate Divisions receiving water from the transferred works are entitled.... [W]hen in times of scarcity it becomes necessary to deliver less than the capacity of the canal, the *water available* shall be divided ratably among the various

*divisions of the project* in the proportion to the acreage of each division.

Complaint in Intervention Ex. 1 ¶¶ 19 and 58 (underlined emphasis added).

The Bureau was well aware that the disputed language of its contracts with the government districts providing for pro rata division among the "divisions" of the project would exclude the Warren Act contract lands. Ex. 244 ¶ 13 (April 3, 1926 letter from then Chief Engineer Walter commenting on the provision in GID's proposed contract).

Although some of the government districts were in operation earlier than other government districts and some of the government districts had earlier contracts with the government, the government districts all have certificates of appropriation for natural flow and for storage with the same priority date of December 6, 1904.

Up to 1931 the water supply for the North Platte project was reasonably adequate. However, in 1931 a dry cycle started that lasted for the following 13 years.[15] As a result, in 1931 there was a shortage of water and for the first time the Bureau could not deliver all of the water under all of its contracts. The Bureau allocated the stored water and included the Warren Act contractors in the allocation. Exs. 31–36.

During the time of the first allocation Farmers filed a request (Farmer's Request to Amend) with the Bureau for a modification of its Warren Act contract to allow it to draw its Warren Act storage water at any time during the irrigation season. Ex. 247 (March 24, 1931) *See* generally Ex. 37. Other parties used Farmer's Request to Amend to advance their respective positions on matters of interest to them. Gering advanced its contention that the 1931 allocation was improper. Hill advanced its contention that by its Warren Act contract it had not

---

**15.** The history of 1930s drought is explained in *Nebraska v. Wyoming,* 325 U.S. at 598–99, 65 S.Ct. 1332.

conveyed its natural flow rights to the United States.

GID and Pathfinder used the Farmer's Request to Amend proceeding to assert exactly the same position they advance in this proceeding—that the government districts have a prior right to the water under the Warren Act and under the express language of the Warren Act contracts. *Id.* The Warren Act contractors strongly disputed this position, including the theory of the government districts that the Warren Act contractors were not part of the project or project lands.

The North Platte Project's chief engineer, by then Mr. Walter, decided Farmer's Request to Amend and sent out his decision letter dated May 27, 1932. In addition to the issue raised by Farmer's Request to Amend, Chief Engineer Walter's decision letter decided the collateral issues raised by other parties in the form of comments on the Request to Amend. He found that under the Warren Act contracts, the contractors "surrendered their river appropriations to the United States."[16] Ex. 37 Doc. 6 at 4. He also opined as follows:

> The third question discussed by the parties in their comments involves an interpretation of the provision, "preserving a first right to lands and entrymen under the project," which appears in Section 1 of the Act of Congress ... known as the Warren Act. The contention is made that the cited provision of the act grants the project irrigation districts; that is, districts under contract to repay the United States the cost of certain divisions of the North Platte project and to operate and maintain them, a poor right to the use of the project water-supply made available by the United States over districts and associations contracting with the United States for a water-supply under the Warren Act.

> It is not believed that the cited language from Section 1 of the Warren Act

was intended to grant priority to the project irrigation districts over Warren Act contractors, but was intended as a direction to the Secretary of the Interior not to oversell the project water-supply.

> ... Appeal from this decision may be taken ...

Ex. 37, Doc. 6 at 5.

Farmers, Pathfinder, Gering and Hill appealed the decision to the Commissioner. On appeal, the portions of the Chief Engineer's decision upon which defendants now rely were not upheld and instead were disavowed. The Commissioner's November 3, 1932, Decision on the appeal is as follows:

1. ... The Gering Irrigation District appealed ... its complaint being that an alleged improper allocation of storage water from Pathfinder Reservoir was made during 1931. This discussion seems immaterial in the present connection, and even if material, it can not be foretold that the conditions existing in 1931 will be repeated in the near future.

2. ... The Pathfinder Irrigation District appealed *claiming a first right as against the Warren Act contractors on the project,* to store water in Pathfinder reservoir.

3. The Hill Irrigation District appealed claiming that it had not conveyed or purported to convey its natural flow water rights to the United States, *a point immaterial to the present discussion, which is restricted to the advisability or inadvisability of making a supplementary contract with the Farmers' Irrigation District.*

4. The facts are stated in the decision of the Chief Engineer and need not be repeated. The Farmers' District desires its contract amended in such a way that the United States would agree to furnish a larger supply of

---

**16.** This position was subsequently decided against the government in the *Tilley* case.

stored water for the same consideration as in the existing contract. Other contractors having rights in the project stored water supply objected, and the experience of 1931 shows that the storage water supply may be deficient in short years.

5. A request by one party to a contract to the other party to amend the contract in favor of the first party is in no sense of the term a petition for a legal right. It is best addressed to the benevolence of the other party, and in a case such as the present where such petition could not be granted without detrimental consequences to other parties having similar water supply contracts, the petition must be denied as a matter of course, and it is denied, with the right of appeal to the Secretary of the Interior ...

6. Various parties have interjected *collateral issues which are not material to the present inquiry and need not be now determined. It is understood that the rights of no interested party shall be in any wise prejudiced by failure to appeal from decision of the Chief Engineer upon any collateral point not herein specifically passed upon.*

7. A point much *mooted* was the nature of the Warren Act contractors' rights on the project. These contracts have been made and *it is believed do not reserve to the Secretary of the Interior the power conclusively to solve any doubt that may arise therein upon the meaning of the language thereof relative to the equality vel non of the Warren Act water rights as compared with the project water rights.*

8. The situation is such that *the Bureau would welcome legislation definitively clarifying the project water right situation, or any other proper action that would have this effect.*

Ex. 37, Doc. 10 (underlined emphasis added).

Thus, the Commissioner expressly limited his decision on appeal to the issue of Farmer's Request to Amend, the only issue decided. He expressly stated the issues of the relative priority of the rights of the Warren Act contractors versus those of the government districts, was, as with the issue of the Warren Act contractors' natural flow rights, a "collateral issue" *not* decided. The decision on appeal expressly provided that none of the parties could be prejudiced if they had not appealed from the Chief Engineer's decision on the collateral issues. Finally, the Commissioner states his opinion that the Secretary of the Interior lacks authority to resolve the priority dispute between the government districts and the Warren Act districts. The Commissioner's decision on appeal provides for a further appeal to the Secretary of the Interior. Although Farmers, the only party whose rights were determined by the decision on appeal, began that process, see Ex. 37, Doc. 8, Farmers eventually dropped the issue due to its receipt of a favorable decision in the *Tilley* case.

In the years 1932 and 1933 there were no water shortages and therefore no allotments. In 1934, 1935 and 1936 there were shortages and allotments. Ex. 199 at 6–7. In 1937 and 1938 there were no shortages and therefore no allotments. In 1939 there was a shortage and an allotment.

In 1940 there was another shortage and an allotment. Farmers (formerly Tri-State) strongly protested the Bureau's proposed 1941 allotment method as contrary to a then-recent Nebraska Federal District Court's decision called *Tilley* and as contrary to the Bureau's previous allotment methods. Ex. 199. The dispute apparently centered on the other users' and the Bureau's belief that unlike in other years Farmers had not "played ball" and cooperated in use of water. *Id.*

Although disputed in the 1930s, the issues of whether the project districts had a priority over the Warren Act contractors was, like the issues of ownership of return flow and the effect of the Warren Act contracts on natural flow, not settled in the 1930s. As noted above, the priority issue, like the other collateral issues were expressly excluded from determination by the Commissioner's November 3, 1932, Decision on Appeal from the Chief Engineer's Decision. *See* Ex. K, Doc. 19, (June 15, 1937, Memorandum noting that Interior Secretary had failed to pass on a number of "very troublesome" Warren Act contract issues).

In 1940, the Commissioner asked the Bureau's District Counsel for an opinion on, among other things, the issue of the government districts' claim of priority. *Id.* at Doc. 20. The District Counsel opined that "the Secretary has the power, if not the duty, to make an allocation of storage water in years of shortage so as to protect the first right to its use by the project landowners." *Id.* at Doc. 20 (May 20, 1940, reply).

On May 29, 1940, the District Counsel elaborated on his reply and noted that the issue was "one of considerable complexity" and that the Bureau had "discouraged" Pathfinder's 1940 "agitation" "for litigation to decide the question." *Id.* at Doc. 21 (May 29, 1940 reply). Apparently, the District Counsel did not closely read the Commissioner's November 3, 1932 decision, because while he notes the Commissioner "sustained" Chief Engineer's Walter's decision, he does not note that the appeal only sustained the decision to deny Farmer's request while the relative priority issue was one of the issues that the Commissioner expressly excluded from the proceedings on Farmer's Request to Amend. Nor did the District Counsel note that the Commissioner's decision determined that the Interior Secretary's author-

ity, and therefore the authority delegated to the Commissioner and Project Manager, did not extend to resolving such a priority dispute. The District Counsel did correctly note that Farmer's Appeal to the Secretary was not decided because the *Tilley* case was filed. The District Counsel opines, optimistically, that the *Tilley* case may be resolved in such a way that the river would be managed to the benefit of the government districts so that they would not need to assert priority over the Warren Act districts.

On June 25, 1940, the Secretary of the Interior, through the Acting Undersecretary authorized the Bureau's proposed allotment to include the Warren Act contractors in accordance with a proposal set forth in a June 17, 1940 letter prepared by the District Counsel to the Secretary of the Interior. The letter advanced the District Counsel's incorrect opinion that the Commissioner's decision on appeal affirmed that portion of the Chief Engineer's decision that held the disputed language was merely a direction not to oversell the water and that there was not a congressional intent to grant a priority to the project lands over the Warren Act contractors in the storage supply available. Ex. K, Doc. 24.

In June of 1940, the Secretary of the Interior, though the Acting Under Secretary authorized the proposed allocation. However, he did not adopt the position proposed by the District Counsel. Instead he expressly provided that the allocation authorization was very limited as follows:

> This authorization, however, is a temporary one and I give it only as a temporary practical expedient, and *without any express or implied departmental construction of the respective rights of the parties concerned.* This procedure is, I believe, justifiable in view of the fact that conflicting interests of parties involved are subjects of pending litigation,[17] the outcome of which perhaps

---

17. "Pending litigation" probably refers to *Tilley* which was then on appeal as well as the

*Nebraska v. Wyoming* case.

1242

must be awaited before Department can with propriety take a permanent position on matters. Furthermore, *you are requested to obtain, before exercising this authority, the consent of the districts in the North Platte project proper to this temporary arrangement.* If this is impracticable or impossible, so advise Commissioner Page with your recommendations and proceed under this authority until you are further notified. *Id.* at Doc. 25.

On December 23, 1941, the *Tilley* case was reversed in part and affirmed in part by the Eighth Circuit Court of Appeals.[18] On appeal in *Tilley,* the United States failed to prevail on its theory that Tri–State/Farmers transferred its natural flow rights to the United States pursuant to Art. XI of Tri–State's 1912 Warren Act contract.

In addition, the *Tilley* decision upheld the United States' claim to seepage or drainage water returned to the river after it was first applied by the appropriator. In determining the issue of the seepage or drainage water, the *Tilley* court firmly rejected the contention that different divisions of the same Reclamation Act project had different water rights depending upon their completion dates.

The 1940s were apparently good water years, with the exception of 1940, where the allocation method was challenged by Farmers, and 1941, where the Acting Secretary of the Interior directed that allocation proceed only with the government districts' consent.

In 1945, the United States Supreme Court announced its landmark decision in *Nebraska v. Wyoming.*[19] The State of Nebraska had filed the case during the drought years of the 1930s contending that diversions in Colorado and Wyoming were depriving Nebraska of its equitable share of the North Platte River's water. A special master was appointed and the resul-

tant decree determined the equitable share of the three states in the natural flow. Because the case involved only natural flow, it did not address the longstanding contention of the government districts that they had a prior right to storage water over the rights of the Warren Act contractors. Because of the decree in *Nebraska v. Wyoming,* the Bureau could not allocate as it had in the 1930s. Becker Test. at 283.

In 1952, the United States entered into Amendatory Contracts with GID and the other government districts (1952 Amendatory Contracts). The reason for the 1952 Amendatory Contracts was to allow the United States to acquire the government districts' interests in the North Platte Project's power facilities. None of the Warren Act contractors were parties to the 1952 Amendatory Contracts. GID's 1952 Amendatory Contract provides:

## EXPLANATORY RECITALS

WHEREAS, under the authority of the Federal Reclamation Law, the United States has constructed the North Platte Project in Wyoming and Nebraska consisting of Pathfinder dam and reservoir, Guernsey dam and reservoir, Whalen diversion dam and desilting works, Fort Laramie Canal and distribution and drainage works serving lands in Wyoming and Nebraska lying south of the North Platte river, the Interstate Canal and distribution and drainage works serving lands in Wyoming and Nebraska lying north of the North Platte River, Lake Alice and Lake Minatare storage reservoirs serving Nebraska lands lying north of the North Platte River, the Northport Canal and distribution and drainage works serving Nebraska lands in the Northport division, sundry drainage diversion works, Lingle Power Plant, canal and appurtenant

**18.** *United States v. Tilley,* 124 F.2d 850 (8th Cir.1941).

**19.** 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815.

works, Guernsey Power Plant and appurtenant works . . .

\*　　\*　　\*　　\*　　\*　　\*

### PROJECT ACREAGE

1. The total number of irrigable acres in the project area resulting after a reclassification of lands . . . approved Nov. 1, 1951, is as follows:

Fort Laramie Division
    Goshen Irrigation District . . . . . . . .52,483.78
    Gering & Fort Laramie Irrigation
    District . . . . . . . . . . . . . . . . . . . . .54,845
Interstate Division
    Wyoming Lands . . . . . . . . . . . . . . . .1,875
    Nebraska Nondistrict Lands . . . . .392.6
    Pathfinder Irrigation District . . . . .100,556.43
Northport Division
    Northport Irrigation
    District . . . . . . . . . . . . . . . . . . . . .13,615
        Total . . . . . . . . . . . . . . . . . . . . .223,767.81

Complaint, Ex. 2 at 1.

Thus, the term "project" as used in the Amendatory Contracts means the North Platte Project containing the divisions as therein defined. This construction is entirely consistent with the parties' use of the terms "project(s)," "North Platte Project" and "division(s)" in the government districts' earlier contracts.

Article 13 of the 1952 Amendatory Contracts provide "[t]he water to be delivered to [GID] under the provisions of this contract from the Pathfinder and Guernsey Reservoirs shall be turned out as ordered by [GID] at a rate not in excess of [GID's] pro rata share of the outlet capacity of said reservoirs. . . ." Complaint, Ex. 2 (GID's Amendatory Contract dated September 22, 1952). Article 14 of the 1952 Amendatory Contracts provide: "[i]n any year in which there may occur a shortage . . . the quantity of water available shall be apportioned among the North Platte Project lands, and [GID's] share thereof shall be in the ratio that the irrigable [GID] lands bear to the total irrigable project lands as set out in Article 1 hereof." *Id.* at ¶ 14. This essentially restates the earlier provisions for pro rata division contained in the 1926 government districts contracts,[20] with the difference that in the 1952 versions of the contracts the exact acreage of each district was specified by reference to "Article 1." [21] This difference results from the fact that in 1926 the exact acreage of each government district was fixed, but not necessarily final. *See e.g.* Pathfinder's 1926 Contract, Complaint in Intervention Ex. 1 at ¶ 2 (classes of lands), ¶ 7 (fixing acreage figure for 1926) and ¶ 59 (lands may be added by petition). By 1952 the irrigable acreage of the government districts had been finalized, and was set out in the contracts so that the ratio for pro rata division was readily determinable. Thus, the 1952 Amendatory Contracts did not add to or materially change the already existing contractual provision for pro rata division in time of shortage except insofar as they clarified the specific number of irrigable acres for each government district.

GID's 1952 Amendatory Contract also provides:

The District, shall carry out in accordance with their correct intent and meaning, and to the satisfaction of the Secretary, *all project contracts of whatsoever kind or nature now in force and shall not attempt in any manner to change the terms of said contracts. Insofar as is permitted by law and if not*

---

**20.** The 1926 government contracts provided for pro rata distribution of water in times of scarcity in slightly different terms. *See* Complaint, Ex. 1 at ¶ 4 (GID's 1926 contract) (quoted at page 1236 *supra*); Complaint in intervention, Ex. 1 ¶ 58 (Pathfinder's 1926 contract) ("when in times of scarcity it becomes necessary to deliver less than the capacity of the canal, the water available shall be divided ratably among the various divisions of the project in proportion to the acre-

age of each division"); *Id.,* Ex. 3 ¶ 46 (Northport's 1926 Contract) (same); *Id.,* Ex. 2 ¶ 27 (Gering and Ft. Laramie's 1926 contract) ("the proportionate share of water actually available from said reservoir to which the lands of the District receiving water from the transferred works are entitled").

**21.** The acreages are not specified in Northport's 1952 contract. Its acreage was determined later. Hall Test. at 207–09.

*otherwise herein provided, the District shall have all rights and privileges in and under all such contracts as the United States now has or would have if this contract were not in effect.*

Complaint, Ex. 2 ¶ 12 (underlined emphasis added).

Pathfinder's 1952 Amendatory Contract provides:

The District shall perform and carry out in accordance with the true intent thereof all obligations imposed upon the United States in all contracts of whatsoever kind affecting the Interstate Division now in force and shall not attempt in any manner to change the terms of said contracts.

Complaint in Intervention, Ex. 4 ¶ 11.

Gering and Ft. Laramie's 1952 contract provides that it shall perform and carry out the obligations of the United States under three named contracts. *Id.* Ex. 5 ¶ 12;

The 1952 Amendatory contracts provide that except as otherwise specified, the earlier contracts with the United States remain in effect. *See* Complaint in Intervention Ex. 5 ¶ 31; Ex. 4 ¶ 33.

At an undetermined time the Bureau informally began to refer to the Warren Act contractors collectively as the "storage division" in the Bureau's repayment book for the purpose of listing payments of operating and maintenance fees. Wilde [22] Test. at 105. This designation was not based upon the language of the Warren Act contracts but was only an informal bureau designation that is inconsistent with the terminology otherwise used by the Bureau. For example, excerpts from the official yearly North Platte Project History show that the Bureau always distinguished the "project districts" or the "four projects districts" from the "Warren Act contractors." *See e.g.* Excerpt from North Platte History for 1940.

In the 1950s the North Platte River drainage again experienced drought. There were drought years in the 1950s, 1960s, 1970s and 1980s and the Bureau proposed allotments in each drought year. The allotments proposed by the Bureau were voluntarily agreed to by all the government districts in the following short water years: 1953, 1954, 1955, 1956, 1957, 1960, 1961, 1964, 1977, and 1981. Injunction Trans. at 116. In all of these years except 1964 the Bureau also obtained the consent of all of the Warren Act contractors for its proposed allotments. In 1964 the Bureau did not obtain the consent of one of the smaller Warren Act Contractor districts, (Lingle or Hill) a district which did not attend the meeting regarding allocation. Injunction Trans. at 133–35.

Beginning in 1954, a Bureau official named Pete Anker guided the allotments using a method he developed. McCracken Test. at 52. Mr. Anker was Chief of North Platte Irrigation Operations. Mr. Anker's method took into consideration the efficiency of each district's use of irrigation water. Under his method the government districts and the Warren Act contractors all received a benefit from the allocation, in part because the Warren Act contractors' natural flow was included in the formula. *Id.* at 53–54; Michael Test. at 477 and 484–85; Excerpt from 1954 Compiled Water Records and North Platte Project History at 13 ("This method of allocation was developed to allow both Warren Act Contractors and the Government Districts to participate in the storage with benefits to both groups. The advantage to Warren Act Contractors gave them an opportunity to receive storage at a later date in lieu of natural flow. The government districts were able to participate indirectly in the natural flows and thus supplement their storage during the entire season.") Thus, in theory, under the Pete Anker method, the government districts did not lose storage water. McCracken Test. at 53.

---

**22.** David Wilde was the North Platte Project manager from 1980 through 1989.

Mr. Anker left the Bureau in 1975 and died in 1984. McCracken Test. at 51. Unfortunately for all the parties the only documentation of the basis of his method disappeared, purportedly borrowed and not returned by "somebody from New York," by the time Mr. Anker left the Bureau. McCracken Test. at 8–9.

Mr. Anker was apparently very good, very persuasive, or more likely, a combination of both. Every drought year where he personally directed the allocations, he obtained the consent to allocation of all the government districts and of all of the Warren Act contracting districts that chose to attend meetings regarding the proposed allocation. McCracken Test. at 77–78. The confidence of the government districts in Mr. Anker's allocation methods apparently was partly because of his continuous "hands on" approach in "babysitting" the natural flow. Jones closing at 541. However, whether or not his methods would have continued to be agreeable to the government districts absent his unique persuasive abilities is not known.

The Pete Anker method, however, was a major departure from the Bureau's contractual agreements. Under the Bureau's contracts with the government districts and with the Warren Act contractors, it agrees to deliver a set amount of water to a specified point of diversion from the North Platte River. Under the Pete Anker method, the amount of water diverted took into consideration factors that included the efficiencies of delivery and use of water subsequent to diversion from the river.

The year 1977 was a short water year for the North Platte Project. The Bureau tried to obtain consent to allocation by all parties pursuant to its attempt at allocating using the Pete Anker method. GID and Gering and Ft. Laramie objected to how the method was applied, specifically to what they perceived as a lack of credit for the water they had saved as a result of certain improvements called rehabilitation and betterment or "R and B," made by the districts. McCracken at 46–7. GID's objection was in writing. Id. In response, the Bureau adjusted the allocation in the objectors' favor and the allocation proceeded. Injunction Trans. at 43.

Although allocation was planned for 1981, it was subsequently suspended due to timely rains. In that year GID did not agree to the allocation and requested delivery of water pursuant to its contract. However, because the planned allocation was suspended, GID's objection was moot and it received its stored water. Injunction Trans. at 108.

By the end of 1988, it was clear to the Bureau that 1989 would also be a short water year. It scheduled a meeting with all parties in December of 1988 to discuss allotment in 1989. It presented three alternatives for proposed allocation. The first two were proffered as variations of the Pete Anker method as re-created without accurate documentation. The difference between the first two proposals was the efficiency figures used, one used figures from the 1950s and the other one used more current figures.

The third method was what the Bureau dubbed "the contract method," although Bureau officials admit it uses a formula that the Bureau never before applied to allocation and one that does not reference any provision of the contracts at issue. This so-called contract method proposes allocation for the government districts based upon the Bureau's division of Pathfinder's storage capacity between the government districts and the Warren Act contractors based upon the percentage of money paid by each group that was applied to Pathfinder's construction costs. See Exs. G and H. Under this formula, the Bureau estimates that the government districts "paid" for 425,802 acre feet of storage and the Warren Act contractors "paid" for 174,198 acre feet of storage. In 1950 the Bureau explained these figures to Wyoming's Congressman Frank A. Barrett as the basis for the contractual allocation of

the operation and maintenance costs to the Warren Act contractors. See Wilde's Test. at 165–67 and Ex. K, Doc. 28 (correspondence relating to Congressman Barrett's questioning whether Warren Act contractors' operation and maintenance fees unreasonable and request to re-open negotiations on such fees).

However, this "contract method" is not based upon any provision of either the Warren Act contracts or the government district contracts at issue. The contracts at issue do not reference any number of acre feet of storage or ownership or entitlement in terms of acre feet of storage. Injunction Trans. at 158. The contracts at issue all involve the entitlement to the release of so many cubic feet per second of water at designated positions. *Id.*

GID objected to the proposed 1989 allocation and contended that the allocation methods proposed did not follow the Pete Anker method, did not fairly take into consideration all necessary factors under the Pete Anker method, or involved methods of allocation different from that used in the past.

The Bureau imposed allocation in 1989, without GID's consent, and this lawsuit resulted. The other government districts, now the intervening plaintiffs, notified the Bureau that they would like to be treated the same as GID regarding the 1989 allocation. Injunction Trans. at 142.

The most significant difference between the years in which the government districts consented to the allocation and the years in which they did not was the method of allocation used. After Pete Anker ceased to ramrod the allocation, the government districts ceased to perceive the allocation method as fair. GID specifically objects to the history periods used to set the efficiency figures. McCracken Test. at 51.

## IV This Lawsuit

On June 23, 1989, GID filed a complaint against the federal defendants, alleging the Bureau breached its 1926 and 1952 contracts with GID by allocating GID less project water than GID was entitled to receive under those contracts. GID sought specific performance and an injunction against any similar allocations in the future.

## V Intervening Parties

On July 18, 1989, the court allowed three irrigation districts organized under the laws of the state of Nebraska, Pathfinder Irrigation District (Pathfinder), based in Mitchell, Nebraska, Gering and Fort Laramie Irrigation District (Gering and Fort Laramie), based in Gering, Nebraska, and Northport Irrigation District (Northport), based in Bridgeport, Nebraska (the plaintiff-intervenors) to intervene as plaintiffs. In their Complaint in Intervention, the plaintiff-intervenors allege that they operate the remaining portions of the North Platte Project works, that their own 1926 and 1952 Amendatory Contracts are, in material part, the same as GID's contracts. Like GID, the plaintiff-intervenors allege the Bureau refused to allocate them the full amount of water they were entitled to under their 1926 and 1952 contracts.

On September 22, 1989, the court allowed three public corporations organized under the law of the state of Nebraska—Farmers Irrigation District (Farmers), Chimney Rock Irrigation District (Chimney Rock), and Gering Irrigation District (Gering)—to intervene as defendants. In their answer in intervention, Farmers, Chimney Rock, and Gering allege they entered into Warren Act contracts with the United States for the use of the excess storage capacity of the Pathfinder Reservoir, and, accordingly, they are entitled to an equitable, pro rata share of the water stored in the Pathfinder and Guernsey Reservoirs in times of shortage, even if the United States is not able to fully satisfy the government districts' asserted entitlement. On December 8, 1989, the court allowed a fourth Warren Act contractor, Lingle Water Users Association (Lingle), a public corporation organized under the laws of the State of Wyoming, to intervene

as a defendant. These intervening defendants are also referred to as the Warren Act defendants or the Warren Act contractors.

On April 23, 1990, the first day of trial, Lingle moved to compel joinder of Hill Irrigation District, a Wyoming irrigation district that, according to Lingle, has essentially the same claims and interests in the litigation as the existing Warren Act defendants. The court denied Lingle's motion as untimely. Accordingly, Hill Irrigation District is not part of this action.

### VI Conclusions of Law

The Reclamation Act was enacted in 1902. The historical context of the Act is briefly traced in 4 Amy K. Kelly and Joseph L. Sax, Waters and Water Rights § 41.02 (Robert E. Beck 1996 ed.). "The basic principle of the 1902 Reclamation Act was that the United States would build irrigation works from the proceeds of public-land sales in the sixteen arid western states." Id. at 458. The Reclamation Act created the Bureau of Reclamation and a special fund in the Treasury to be known as the Reclamation fund.

Under the Reclamation Act the federal government induced people to settle the project's land and to purchase the lands and water rights with the purchase price and annual operating and maintenance charges used to repay the cost of building and maintaining Pathfinder. The consideration to the settlers was the prospect of acquiring lands with a water supply provided by the storage works, in this case Pathfinder reservoir.

As noted in the findings, the Warren Act was passed to allow the use of the excess capacity of the Reclamation Act projects.

[The Warren Act] authorized the Secretary of the Interior to contract with distributors of irrigation waters for the impounding, storage, and carriage of water, to the extent of the excess capacity of the facilities of any project constructed under the Reclamation Act of 1902, ..., not required for the purposes of the lands intended to be reclaimed and irrigated by such projects.

United States v. Tilley, 124 F.2d 850, 853 (8th Cir.1941).

However, when Congress decided to allow others to acquire the storage water in "excess" of the requirements of the project lands, it did so on the strict condition that a "first right" to the use of the stored water would be preserved for the entrymen under the project and the lands of the project. As Secretary Fisher is reputed to have said, "It would be a very serious thing if the government should establish a project and invite settlers to take up the lands and build their homes, and there was" a likelihood of a shortage of water. Supra, at 1224.

The Warren Act provides as follows:

Whenever in carrying out the provisions of the reclamation law, storage or carrying capacity has been or may be provided in excess of the requirements of the lands *to be* irrigated under any project, the Secretary of the Interior, *preserving a first right to lands and entrymen under the project,* is hereby authorized, *upon such terms as he may determine to be just and equitable,* to contract for the impounding, storage, and carriage of water to an extent not exceeding such capacity ... In fixing the charges under any such contract for impounding, storing, or carrying water for any irrigation system, corporation, association, district, or individual, as herein provided, the Secretary shall take into consideration the cost of construction and maintenance of the reservoir by which such water is to be impounded or stored and the canal by which it is to be carried, and such charges shall be just and equitable as to water users under the Government project.

43 U.S.C. § 523 (underlined emphasis added).

Accordingly, all of the Warren Act contracts at issue provide that water users under the government "projects" shall be

prior to the right of the Warren Act Contractor to use the stored water as required by the Warren Act.

The word "entrymen" as used in the Reclamation Act, in the Warren Act and in contracts entered into under these acts, means "one who enters upon public land with intent to secure an allotment under the homestead, mining, or other laws." [23] *See Indian Cove Irrigation District v. Prideaux*, 25 Idaho 112, 136 P. 618 (1913) (citing Webster's Dictionary and holding lands held by entryman under unproven claims pursuant to the Desert Lands Act and the Homestead Act could be included in irrigation district).

The Reclamation Act provides the following definitions as applicable to its various sections:

(a) The word "Secretary" means the Secretary of the Interior.

(b) The words "reclamation law" mean the Act of June 17, 1902 and all Acts amendatory thereof or supplementary thereto.

  *   *   *   *   *   *

(d) The word "project" means a Federal irrigation project authorized by the reclamation law.

(e) The words "division of a project" mean a substantial irrigable area of a project designated as a division by order of the Secretary.

43 U.S.C. § 371.

The Reclamation Act also provides:

The Secretary of the Interior is hereby authorized to perform any and all acts and make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect.

43 U.S.C. § 373.

This authority has been delegated by statute, 43 U.S.C. § 373a, to the Commissioner of Reclamation and further delegated within the Bureau to the Project Manager of the North Platte Project.

Although the definitions set forth in the Reclamation Act, 43 U.S.C. § 371, *supra*, were not expressly made applicable to the Warren Act, the Warren Act refers to the Reclamation Act and is an important component of the Reclamation policies and law of the United States. This is recognized in the Warren Act contracts which note that the Warren Act is a law "amendatory and supplemental to" the Reclamation Act. The court concludes that a plain reading of the Warren Act together with the Reclamation Act reveals that the definitions contained in the Reclamation Act are also applicable to the Warren Act.

Further, the term "project" in the government districts' contracts must be construed as it is defined in the Reclamation Act because each government districts' contract recites that it is made pursuant to the Reclamation Act.

Section 523, quoted above, is section 1 of the Warren Act. As expressly recited in each of the contracts of the intervening defendants, their Warren Act contracts are made pursuant to section 1 of the Warren Act.[24]

---

**23.** Such laws include the following: the Homestead Act of 1862, 12 Stat. 392 (now codified as amended at 43 U.S.C. §§ 161–302); the Desert Land Act of 1877, 19 Stat. 377 (codified as amended 43 U.S.C. §§ 321–339); the Carey Act, 28 Stat. 422 (1894) (codified as amended 43 U.S.C. §§ 641–648); and, the Reclamation Act 32 Stat. 390 (1902) (codified as amended 43 U.S.C. §§ 372–616).

**24.** Section 2 of the Warren Act, codified at 43 U.S.C. § 524, provides for the purchase of different rights. *See* Richard Roos–Collins, *Voluntary Conveyances of the Right to Receive a Water Supply From the United States Bureau of Reclamation*, 13 Ecology L.Q. 773, 838–39 (1987) (explaining difference between contracts entered into under section 1 and section 2 of the Warren Act) and 2 Water and Water Rights § 16.03(g) (same). For an example of a section 2 Warren Act contract affecting Wyoming *see North Side Canal Co. v. State Board of Equalization of Wyoming*, 17 F.2d 55 (8th Cir.1926), *cert. denied*, 274 U.S. 740, 47 S.Ct. 586, 71 L.Ed. 1320 (1927), which involved the Jackson Lake Dam and the Jackson Lake Reservoir, constructed on

Ten percent, or about 400, of the federal government's current reclamation contracts were made under the authority of the Warren Act. 2 Waters and Water Rights § 16.03(g). The contracts at issue in this case are among an even greater minority because they are made under section 1 of the Warren Act. According to the Bureau, there is only one other area with the possibility of a similar allocation dispute between government districts and Warren Act contractors. *See* Patterson Depo. at 32–34 and 46–49 and Ex. K, Doc. 12 (Fourteenth Annual Report of Reclamation Service Contracts under Warren Act showing "permanent water supply" contracts in the North Platte Project and in the Minidoka Project in Idaho).

Hindsight reveals that it may not have been wise for the government to contract for permanent water under section 1 of the Warren Act because that section grants "inferior" rights as explained in the following excerpt from the records of the North Platte Project.

Reference has already been made to contracts authorized by the [Warren Act], under which the bureau has sold permanent water rights from the projects for the irrigation of upward of 1,000,000 acres of land lying outside of the projects.

Section 1 of this act provides for the sale of such rights, "reserving a first right to lands and entrymen under the project." Section 2 of the act provides for contracts "upon such terms as may be agreed upon." These two sections seem to be somewhat in conflict, and there has been a dispute as to their meaning.

It seems to be of questionable propriety for the Government to sell a water right of an inferior nature. Apparently it is a better policy to put all Federal water rights upon the same plane. It is argued by some that the water users under the projects proper should have a better right than the water users outside

the south fork of the Snake River in Wyo-

of the projects. There does not however, seem to be any good reason to uphold this position. The Warren Act contractors outside of the projects pay in full for what they get in the same manner as do the water users under the projects. Moreover, in some cases they actually advance the moneys with which to construct irrigation works to provide for the additional water supply, instead of letting the Government advance the money and paying it back in 20 years without interest.

Contracts under the Warren Act are now rather generally being made under section 2 of the act, and provide for rights having the same priority as those on the project from which the water is sold.

Ex. E.

Even so, the contracts were made under section 1 of the Warren Act and that is the section that controls the rights of the intervening defendants.

The federal defendants contend that through the statutory grant of discretionary power to the Commissioner of Reclamation, 43 U.S.C. §§ 373 and 373a (Reclamation Act) and section 523 of the Warren Act the Bureau has discretion and authority to devise appropriate schemes for the distribution of project water.

There is no evidence in this case that the Secretary or the Commissioner at any time made any rule or regulations relevant to the contracts or the issue before the court. *See* Wilde Test. at 140.

As to the federal defendants' claim that the Secretary of the Interior has the authority, statutorily delegated to the Commissioner of Reclamation, to allocate; the only official decision of a Commissioner of Reclamation on the priority issue before the court in this case is the 1932 Decision on appeal which states that the Commissioner's position that the contracts do not give the Interior Secretary the power to

ming.

resolve the priority dispute between the parties. Ex. 37.

■ The authority to manage the North Platte Project, delegated to the Commissioner of Reclamation, does not grant the Bureau authority to alter or ignore express contractual priority of a water right. None of the contracts in question authorize the Bureau to impose the so-called Pete Anker method of allocation or any of the proposed allocation methods for 1989, on an unwilling government district because in each proposal the pro rata division would be made based on lands other than specified in the contracts. For example, the Warren Act contractors are not included in the "irrigable area of the entire North Platte Project" contractually specified in the 1926 contracts. Neither are they included in the "total irrigable project lands ... as set out in Article 1" as specified in the 1952 Amendatory Contracts.

■ Thus, while the Secretary and Commissioner are empowered to perform any and all acts "necessary and proper for the purpose of carrying out the provisions of the Reclamation Act," the court does not find this includes the power to impose a pro rata division of water different from the pro rata division that is spelled out in the contract. Cf. Arizona v. California, 373 U.S. 546, 593, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (holding Secretary has authority to determine the apportionment method in time of shortage because "neither the Project Act nor the water contracts require the use of any particular formula for apportioning shortages").

Similarly, while section 523 of the Warren Act empowers the Secretary to make contracts "upon such terms as he may determine to be just and equitable," that grant of power is expressly limited by the preceding portion of the same sentence which limits all actions of the Secretary of the Interior in entering such contracts to "preserving a first right to lands and entrymen under the project ..." Further, section 523 relates to the Secretary of the Interior's authority to make the contracts, not to the subsequent interpretation of the contracts or to the administration of the projects.

■ Defendants all contend that the contracts are ambiguous and should be construed in accordance with the parties' intent. Thus, this case ultimately reduces to ordinary contract construction.

The defendants make the following arguments in support of their contention that the government districts' contracts are ambiguous. The federal defendants contend that the contracts are ambiguous with regard to the amount of water the government districts are entitled to in times of shortage. They contend the ambiguous provision must be construed in accordance with the Bureau's alleged intent to provide for distribution of water equitably between the government districts and the Warren Act contractors. In support of this interpretation of the parties' understanding the federal defendants contend as follows: The later divisions of the North Platte Project were limited to include only those lands that could receive a full supply from Pathfinder Reservoir after the needs of the Warren Act contract lands had been accounted for. The annual operation and maintenance fees were derived from calculations that included the Warren Act contractors' rights in the stored water. The Warren Act contractors have been included in the allocations in the past. The 1926 government district contracts and the 1952 Amendatory contracts provide that the government districts shall carry out "all contracts of whatever kind" and "all contracts of whatsoever kind or nature" imposed upon the United States.

The intervening defendants contend that the following phrases in the government districts' contracts are ambiguous: "North Platte Project," "entire North Platte Project," "available water supply," "amount of water available," "all project contracts of whatever kind or nature now in force," and "whole amount then available for delivery to the entire Fort Laramie Division."

They also contend that the following phrases from their Warren Act contracts are ambiguous: "water users under projects of the United States Reclamation Service dependent for storage upon the said storage works," and "greater area of land in the aggregate than can in [the Secretary's] opinion, be furnished with an adequate supply of water in all years of ordinary runoff."

The federal defendants contend that the intent of the parties is shown by the Interior Secretary's 1911 and 1912 letters and statements. The defendants generally contend that the intent of the parties can be shown by the Secretary's statements and the inter-departmental correspondence relating to the Warren Act contracts.

Intervening defendants contend that the language of the government district contracts providing that the government districts shall carry out the contractual obligations of any kind whatsoever imposed on the United States means that the government districts are required to not interfere with the Bureau's contracts to provide water to the Warren Act contractors.

The court finds and concludes that the contracts at issue are not ambiguous. Under a plain reading of the Warren Act contracts, they grant a prior right to the government districts and require the United States and the Warren Act contractors to recognize that prior right. As noted, Gering's Warren Act contract provides: "[i]t is further understood that the water users under projects of the United States Reclamation Service dependent for storage upon the said storage works shall be prior to the District and to water users therein in right to the use of stored waters from the said storage works in accordance with Article 1 of the Warren Act." Ex. 7 Art. 11. Each of the other Warren Act contracts contain this same express recognition that the government districts will be prior in

right to the Warren Act contractor for Pathfinder's storage water. *See* Tri-State/Farmer's contract Ex 1 Art. XII (same); Chimney Rock's contract Ex. 9 Art. 11 (same); Lingle's contracts Ex. 14 Art. 13,[25] Ex. 19 Art. 18 ("The water users under projects of the United States Reclamation Service dependent for storage upon the storage works shall be prior to [Lingle] in right to the use of stored waters from said storage works.") and Ex. 20 Art. 19 (same).

The fact that the Bureau may have scaled down portions of the later divisions of the project recognizing that the estimated excess capacity was not in fact, in excess of the requirements of the lands of the project, does not change the plain language of the Warren Act contracts which preserve for the government districts a first right to the use of Pathfinder's stored waters.

Similarly, the fact that the operation and maintenance fees were allocated based upon the assumption that there would always be a "safe" supply of 600,000 acre feet of storage water does not change the plain language of the Warren Act contracts which preserve a first right to the use of the stored water for the government districts. The court does not find the Warren Act contractors' payments, including their operating and maintenance payments, show an intent to create something other than that specified in the plain language of the Warren Act contracts and the Warren Act. The Warren Act itself provides that in fixing the charges to a Warren Act contractor the Secretary shall take into consideration the cost of construction and maintenance of the reservoir while at the same time providing that the contracts shall preserve a first right to the lands and entrymen under the project. 43 U.S.C. § 523.

25. Lingle is the assignee of Goshen Land Company, signatory to the July 1, 1915, War- ren Act contract.

The plain meaning of words "project(s)" and "division" in the government districts' contracts and in the Warren Act contracts is the same meaning as set forth in 43 U.S.C. § 371. This plain reading of these words shows the other phrases are not ambiguous. Thus the "project lands" include only the lands of the government districts. The phrase "water users under projects of the United States Reclamation Service" in the Warren Act contracts means the water users under the government districts. The phrase "water available" in the government districts' contracts means the storage water in the North Platte Project's storage works. Because the water users from the government districts have a "first right" to the storage water, "water available" in the government districts' contracts means the water in the storage works before any secondary rights are considered. The phrase "North Platte Project" means the project as defined under the Reclamation Act. The phrase "entire North Platte Project" means all of the government divisions and districts and not only that division (Pathfinder) that was in existence at the time of the first Warren Act contract.

Defendants contend that the "carrying out obligations of contract" provisions included in each of the government districts' contracts obligate the government districts to recognize or not interfere with the Bureau's obligations under the Warren Act contracts. *See* Wilde Test. at 126–29. These provisions generally provide as follows: "[t]he District shall perform and carry out in accordance with their true intent and meaning, ... all obligations imposed upon the United States in all contracts of whatever kind" and "the [government] District shall carry out in accordance with their correct intent and meaning, ... all project contracts of whatsoever kind ..." Complaint Ex. 1 at ¶ 17 (GID's contract); *See* the provisions quoted *supra*, pp. 1237, 1238 and 1244.

These provisions relate to obligations of the then newly-formed government dis-

tricts to generally take over the operation of the project facilities from the United States. The provisions generally obligate the government districts to "carry out" certain contracts as the government's assignee under pre-existing contracts affecting the project facilities in that district. *See* Northport's contract at ¶ 13 ("The District as assignee shall perform and carry out in accordance with their true intent and meaning ... all obligations imposed upon the United States in all contracts of whatever kind, affecting said ... Divisions ...").

A plain reading of these provisions shows that they do not refer to the Bureau's Warren Act contracts because when the government districts took over the maintenance and operation of the project facilities they did not take over the United States' obligations under the Warren Act contracts. Thus, the Warren Act contracts are not contracts in which the government districts "have all rights and privilege ... as the United States now has or would have" if the government districts' contracts "were not in force." The Bureau's Warren Act contracts are not contracts for which the government districts agreed to "carry out" the "obligations imposed upon the United States" and therefore they are not included in those provisions.

█ Where the language of the contracts is clear and unambiguous, the court looks to that language to determine the intent of the parties and resort to extrinsic evidence cannot be justified. *Wolter v. Equitable Resources Energy Co., Western Region*, 979 P.2d 948, 952–53 (Wyo.1999) ("We do not, however, look to extrinsic evidence of the parties' historical performance of a contract when the contract language is clear on its face."); *Krzycki v. Genoa National Bank*, 242 Neb. 819, 496 N.W.2d 916, 921 (1993) ("A written instrument is open to explanation by parol evidence only when it is ambiguous in its terms."). The intent of the parties is shown by the contracts. *Id.*

The government contracts specify that in times of shortage the Bureau may allocate water pro rata based upon the number of irrigable acres in the government districts comprising the entire North Platte project. The Warren Act contracts provide that the rights of water users under the government projects shall be prior "in right to the use of the stored water" to the rights under the Warren Act contracts. Because this language is plain and unambiguous in recognizing the government districts' priority, resort to extrinsic evidence cannot be justified. Further, even if the court were to consider the many documents submitted by defendants as showing the Bureau's intent, that intent is consistent with the plain meaning of the contracts at issue.

As an initial matter, the court notes some of the materials submitted by defendants are of unknown provenance. For example, it is not known by whom, the method used or how accurately the Mitchell meeting of August 4, 1911, was recorded. Further, interdepartmental letters do not necessarily reveal the Bureau's or the Secretary of the Interior's intent or understanding when entering a contract. For example, letters submitted in this case reveal that some persons in the Bureau were advancing their own ideas, *see* Ex. 80 ("it is my idea"), while it is the official policy of the Interior Secretary that controlled the creation and administration of the contracts. *See* Ex. 222 (Field officials' acknowledgment that the Secretary's communications modified the policy against allowing old ditch companies to use Warren Act water for previously unirrigated lands.)

The Secretary of the Interiors' communications regarding the Warren Act contracts are fully set forth in the findings. While a casual reading of the transcript of the August 11, 1911, meeting in Mitchell

may be susceptible to defendants' interpretation, a closer reading reveals no intent to give the Warren Act contractors equal priority to that of the government districts. In fact, the remarks cited by defendants did not relate at all to the issue of priority of water rights. Instead, as noted in the findings, the remarks cited by defendants related only to the issue of where, within their own districts, the old ditch companies could apply the surplus storage water to be purchased.[26]

All of the Secretary's communications involving the Warren Act contracts make it clear that all contracts for the purchase of excess storage water would be "subject to the limitations imposed by" the Warren Act, which required that the first priority of project districts be "preserved."

Intervening defendant Farmers also contends that the Warren Act itself is ambiguous or that the Bureau interpreted it as being ambiguous. In support of this position, Farmers cites Mr. Newell's remark at the 1911 Mitchell, Nebraska meeting. Once again, it is of dubious value to divine the Bureau's understanding from such sources. However, even considering the remark it does not support the position that the Bureau found the Warren Act to be ambiguous at the time it entered into the Warren Act contracts. As reported, at the Mitchell meeting, Mr. Newell, when reading the Act, does not say he doesn't know what the "preserving a first right" language means. Instead he says he does not know why Congressman Kinkaid insisted on including the requirement.

The intervening defendants also rely on the 1931 Decision letter by Chief Engineer Walter as determining what the disputed contract language meant and also for the preclusive effect of that 1931 Decision letter. The court gives no weight to the findings in the 1931 Decision letter on collateral issues such as the government

---

26. Why this position was so popular with the audience as to elicit "unanimous and hearty applause" can only be a matter of conjecture at this point; but it may reflect the concern of those who were present and invested in farms over those who were not present and who had not yet purchased land.

districts' claim of a first priority because, as noted above, that part of the Decision letter was specifically overturned and disavowed by the Commissioner's decision on appeal. Thus, it is of no effect.

The contention that the failure to appeal that decision has a preclusive effect is similarly negated by the Commissioner's express holding in the 1932 Decision on appeal that "the rights of no interested party shall be in any wise prejudiced by failure to appeal from the decision of the Chief Engineer upon any collateral point." Ex. 37. Thus, none of the parties to the 1930s allocations and Farmer's Request to Amend were foreclosed by their participation therein from asserting that future allocations or allocation methods were improper. For example, in 1940 Farmers began its ultimately successful assertion that its Warren Act contract did not have the effect of conveying its natural flow rights to the government—a position that was not foreclosed by the Chief Engineer's 1932 Decision letter to the contrary.

Further, the Chief Engineer's position that the disputed provision was intended to be merely a "direction" to the Secretary of the Interior not to oversell the water cannot be supported by the plain language of the provision or the communications of the parties. For example, the first Warren Act contract contained a separate provision expressly addressing that issue and providing it was "understood that the Secretary shall provide for the irrigation from the Pathfinder Reservoir of no greater area of land in the aggregate than can in his opinion be furnished with an adequate supply of water in all years of ordinary runoff." Ex. 1, Art. XIII. If the disputed language was meant as a direction not to oversell, it would have rendered Art. XIII of the first Warren Act contract redundant. The fact that such a provision not to oversell is not included in the later Warren Act contracts may be the result of the fact that the Bureau personnel had already expressed concerns that the water was being over-

sold by the time the later contracts were signed.

The federal defendants contend that the Warren Act contracts do not specifically say that the contractors are entitled to the set amount of water only if available after government district contracts were met, and therefore the Bureau is entitled to include the Warren Act contractors' acreage in determining the contractual pro rata division. The court disagrees, the Warren Act contracts *do* effectively say the Warren Act contractors will receive water only after the government districts. The Warren Act contracts expressly provide "the water users under the government projects ... shall be prior to the [Warren Act] district and the water users therein in right to the use of stored waters ... in accordance with Article 1 of the Warren Act." This can only mean that the government districts receive their water first. The inclusion of the provision was required by the Warren Act's express requirement that the Secretary of the Interior's authority to enter into contracts for the sale of the excess storage capacity was limited by the requirement that such a first right be preserved. Any issue regarding any division of the remaining storage water among the Warren Act contractors is not before the court.

Lingle also makes an ambiguity argument. According to Lingle, the Bureau intended that the supply of storage made available through Warren Act contracts be prior in right to any new or additional lands constructed or reclaimed as part of the North Platte Project, but secondary to rights of the already existing Pathfinder Irrigation District. In support Lingle cites a comment from the Warren Act's legislative history. *See* Trans. at 587–588. This is the identical argument advanced by Gering Irrigation District in the proceedings involving Farmer's Request to Amend in 1931. *See* Ex. 37, Doc. 4 at 6.

As noted above, the Warren Act itself and the Warren Act contracts are not ambiguous. Where the statute "straightfor-

wardly command[s]" preserving first priority for the government districts, "there is no reason to resort to legislative history." *U.S. v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) (citing *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("When the words of a statute are unambiguous, then, . . . 'judicial inquiry is complete.' ") (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981))). *See also Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, ——, 119 S.Ct. 1411, 1425, 143 L.Ed.2d 607 (1999) (Thomas, J., concurring) ("A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong."). Further, the "remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

The plain language of the Warren Act belies Lingle's interpretation affording different priorities to the water rights held by the different divisions of a single Reclamation Act project. It is undisputed that only one of the North Platte Project's divisions, Pathfinder, was in existence at the time the Warren Act contracts were negotiated and signed. However, the Warren Act speaks in the future tense of the lands for which first priority must be preserved; namely, "lands *to be* irrigated under *any* project" and not just the project lands that were already irrigated at the time of the contracts. All of the Warren Act contracts incorporate this statutory language by specifying the priority preserved for the government districts is "in accordance with Article 1 of the Warren Act." Ex. 1, Art. XII; Ex. 7 Art. 11; Ex. 9 Art. 13; Ex. 19 Art. 18; Ex. 20 Art. 19.

As noted above, the *Tilley* court firmly rejected the proposition that different divisions of the same Reclamation Act project had different water rights depending upon their completion dates.

The contention that each District or division should be treated as a separate unit in determining the scope of the rights in the waters applied to the lands under the project rests upon a provincial view as to the real nature and object of a reclamation project, and it fails to take into account the fact that the State has itself recognized the unity and integration of the project by making possible and allowing a single appropriation to be made for the benefit of all the lands thereunder.

The fact that the Northport division of the project was not completed until several years after the other two divisions is not of any significance on the question here involved, since the State has at no time attempted to claim that the benefits of the original appropriation became lost to the lands in the Northport division, by delay and as a matter of legal abandonment.

*Tilley,* 124 F.2d at 861.

Defendants also contend that the Warren Act contractors are part of the North Platte project, and therefore they are included within the meaning of the phrase "North Platte Project lands" as set forth in the government districts' 1952 Amendatory Contracts' provisions specifying pro rata apportionment of "water available" based on "total irrigable project lands." [27] *See* Complaint in Intervention Ex. 4 ¶ 16 (Pathfinder's 1952 Amendatory Contract) ("In any year in which there may occur a shortage . . . the quantity of water available shall be apportioned among the North Platte Project lands, and the District's share thereof shall be in the ratio that the

---

**27.** As noted above, the government districts' 1926 contracts provide for pro rata distribution among project lands in slightly different language. However, defendants' theory is the basically the same for the 1926 contracts as for the 1952 Amendatory Contracts, namely that the Warren Act contractors are part of the North Platte project and therefore their lands are part of the project lands upon which the pro rata division is to be based.

irrigable district lands bear to the total irrigable project lands as set out in Article 1 hereof."); *Id.*, Ex. 5 Art. 14 (Gering & Ft. Laramie's 1952 Amendatory Contract) (same); Complaint Ex. 2 Art. 14 (GID's 1952 Amendatory Contract) (same quoted *supra* at page 1243). Therefore defendants contend that the Warren Act contractors are included in the "North Platte Project lands" among which the stored water is to be apportioned in drought years.

The court disagrees. As noted above, the phrase "North Platte Project" means all of the government divisions and districts in the "project" as defined under the Reclamation Act. In the case cited by plaintiffs, *Bean v. United States*, 143 Ct.Cl. 363, 163 F.Supp. 838 (1958), the plaintiffs therein, Warren Act contractors, argued that they were part of the Reclamation Act "project" because they were within the geographical area. The United States Court of Claims (now the United States Court of Federal Claims), held:

> The mere fact that plaintiffs' land might have been in the geographical area of the irrigation works authorized by the Act of 1905, *supra*, is of no moment. They can not benefit by the appropriation notices of 1906 and 1908 unless the Secretary of the Interior made their lands a part of the project for which the waters were appropriated, because, as we have said, he has the right to determine what lands were to be included within the project. In our opinion plaintiffs' case stands or falls depending upon whether or not their lands were a part of Rio Grande project, because if they were not, plaintiffs' rights are to be determined by the Warren Act and by [their] contracts ...

163 F.Supp. at 841.

In *Bean*, the Warren Act contracts at issue provided for the mere rental of water, a right that was not vested and could be ended at any time and for that reason, the *Bean* contractors did not pay annual operation and maintenance charges or pay

a proportional share of the cost of the project. *Id.* In this case, the Warren Act contracts at issue provide for a vested right in the stored water, and also provide for a payment of the annual operation and maintenance costs. However, the contracts further provide that the water users under the projects of the Reclamation Service retain a prior right to the use of the stored water. Thus, unlike the *Bean* case, the Warren Act contracts in this case cannot be unilaterally terminated by the Bureau, but neither can the Bureau ignore the prior right to the water held by the government districts.

The Warren Act contractors are not part of the North Platte project within the meaning of the Reclamation Act or as defined in the government districts' contracts. Therefore their lands are not part of the "North Platte Project lands" or of the "total irrigable project lands as set out in" the government districts' contracts. As a result, the Warren Act contractors' lands may not be included in the Bureau's pro rata division of the project's stored water in drought years.

The Warren Act contractors contend that if the contracts are given their plain meaning what they purchased is of no value. Nonetheless, the plain language of the Warren Act contracts and of all of the public communications from the Secretary of the Interior clearly informed the prospective Warren Act contractors that what they were purchasing was subject to the preserved first right for the lands and entrymen of the Reclamation Act project. Having chosen to purchase such a right, the court is not able to re-write the contracts to give the Warren Act contractors what the Warren Act forbids—a right to use the water from a Reclamation Act project without preserving a first right to the use of such water for the entrymen under the government projects.

■ However, the Warren Act contractors still retain what they contributed under the Pete Anker method of allocation,

their natural flow. Therefore, by today's decision, they do not lose water. What they do lose is the benefit of the Bureau's attempt to unilaterally force the government districts to participate in an allocation of Pathfinder *storage* water using a formula other than the formula set forth in the government districts' contracts. Conversely, by not agreeing to a compromise allocation formula the government districts retain what they contributed under the Pete Anker method—storage water—but lose the way in which they benefitted under the Pete Anker method—by having the Warren Act contractors' natural flow included in the divisible amount of water in a drought year. The Warren Act contractors' ability to manage their natural flow to their own advantage appears to provide a strong basis for bargaining in connection with any proposal for allotment in a short water year.

In addition to their contentions that the contracts are ambiguous, the intervening defendants (but not the federal defendants) also raise the affirmative defenses of waiver, estoppel and laches.

█ It is not necessary for this court to determine if the law of Wyoming or the law of Nebraska applies to the affirmative defenses of waiver, estoppel and laches, because the intervening defendants have not met their burden of showing the elements under the laws of either state. *E.g., New Jersey v. New York,* 523 U.S. 767, 118 S.Ct. 1726, 1748, 140 L.Ed.2d 993 (1998) (affirmative defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.") (quoting *Kansas v. Colorado,* 514 U.S. 673, 687, 115 S.Ct. 1733, 131 L.Ed.2d 759 (1995)).

In support of these affirmative defenses, the intervening defendants contend that the government districts are estopped from asserting their right to a first priority because they agreed to, or failed to protest, allocation in the past, because they failed to pursue appeal after the 1932 decision in Farmer's Request to Amend, and because the government districts failed to act for almost 60 years. By their allegation that the government districts failed to act for 60 years, presumably the intervening defendants mean failed to litigate the priority of their right to the storage water.

The evidence in this case is that in the 1930s the government districts did assert their contractual rights to a first priority. The fact that they did not pursue the issue after the Commissioner's 1932 decision on appeal is, for the reasons stated above, not determinative of their rights.

The evidence shows that at the time of the allocation in the early 1940s the issue of the *government districts'* claim of a first priority was very much still in dispute and that the Bureau "discouraged" at least one district, Pathfinder, from pursuing litigation.

After 1941 it is undisputed that the Bureau obtained the consent of every government district prior to allocating in all years except the year at issue in this case. The court does not find that such express consent before each allocation gives rise to waiver, estoppel or laches. The Warren Act contractors knew that the allocations were imposed only after consent, because they too were asked for, and gave, consent.

If this court were to find that by expressly consenting to an agreed-upon method of allocation of stored water in a drought year, an irrigation district thereby waived any priority rights or was estopped by laches or otherwise from ever raising those rights, it would put an immediate end to any possibility of beneficial and necessary short-term agreements in the area of water rights.

The court finds and concludes that the government districts did not, by consenting in drought years to an allocation method other than that specified in their contracts, lose their first priority right any more that the Warren Act contractors permanently lost their rights to demand their natural flow by consenting in drought

years to the Pete Anker method under which they effectively threw their natural flow into the common pot.

For the reasons stated above, the government districts have a right of first priority in the storage water. Absent agreement, the only pro rata distribution of that first priority storage water that the Bureau may make in times of drought is the distribution set forth in the government districts' 1926 and 1952 contracts. Those contracts specify the lands among which the water can be divided—lands that do not include the lands covered by the Warren Act contracts.

### VII   Conclusion

This case is the culmination of a dispute that has hovered over the North Platte Project since the drought years of the 1930s. Like the other issues involving the North Platte River, this issue is brought to federal court for resolution. The expertise and experience before the court at trial was impressive. Representatives of the federal defendants have spent many years managing the North Platte Project. Their years of helpful experience are fully matched by those of the representatives of the various irrigation districts, several of whom rose from early jobs as ordinary ditch workers to later manage the large irrigation districts where they also farm. However, despite the best efforts of all of those involved, there is simply not enough storage water. The so-called "reliable supply" of storage water turned out, despite the Bureau's good faith estimate based upon the best evidence then available, to be unreliable. As a result, the stored water was over-committed.

At trial, various parties invited the court to choose an allocation method to be imposed on the parties; however, this is an action for declaratory and injunctive relief and the court does not sit as a special master. Thus, the issue of which of several viable allocation options would be most beneficial to the parties as a whole is not before the court. What is before the court is the government districts' complaint for declaratory judgment. By their Complaint the government districts contend that the federal defendants violated their contracts in 1989. Based upon the entire record in this case the court must agree. The federal defendants failed to recognize the government districts' first priority for the use of the storage water. The federal defendants violated their contracts with the government districts in 1989 by using an allocation method other than the pro rata method specified in the government districts' contracts. The federal defendants also violated the government districts' contracts in 1989 by prorating the water among acreage other than the North Platte "project lands" as specified in the government districts' contracts.

Like the previous court resolutions of important issues impacting the river in such cases as *Nebraska v. Wyoming* and *Tilley,* the court's decision today may raise additional concerns. Thus, it is important to note what this decision does not involve.

By its holding today the court does not in any way limit the government districts from agreeing to an allocation formula that includes the Warren Act contractors. Although the court holds that the Bureau may not impose on an *unwilling* government district an allocation based upon an acreage figure that includes acreage other than that specified in their contracts, it may well be in the government districts' interest to consent to such an arrangement in exchange for the Warren Act contractors' cooperation regarding natural flow rights. Such agreements served the parties well in the past; but such a matter is for voluntary agreement.

As previously noted, this decision does not in any way involve the parties' respective rights to natural flow. Nor does it involve whether, or by what method, the Bureau can allocate the remaining storage water among the Warren Act contractors in drought years. Finally, it does not involve any issue of the Warren Act contractors' obligations for operating and mainte-

nance expenses in drought years in which they receive less than their contractually-agreed amount of water.

The court also notes that it appears that any dispute between the states of Wyoming and Nebraska and the Bureau over allocation of storage water in drought years is the subject of a stipulation entered in connection with the 1945 Decree in *Nebraska v. Wyoming*, 325 U.S. 665, 66 S.Ct. 1, 89 L.Ed. 1857 (1945), as modified, 345 U.S. 981, 73 S.Ct. 1041, 97 L.Ed. 1394 (1953). *See* Stipulation Among the State of Wyoming, the State of Nebraska, and the United States Relating to the Allocation of Water During Periods of Shortage, filed in the *Nebraska v. Wyoming* case, *supra.* However, that stipulation does not resolve the issue before the court in this case. *See Id.* at § 5 at 4.

The court will enter a separate judgment declaring that the plaintiff and intervening-plaintiffs have a first right to use the stored water and that the Bureau violated its contracts with the plaintiff and intervening plaintiffs by the way in which it conducted the 1989 allocation. The complaint for injunctive relief appears to be moot.

### JUDGMENT

This action came to trial before the Court. The issues have been tried and Findings of Fact and Conclusions of Law have been entered. It is therefore

ORDERED, ADJUDGED AND DE-CREED that plaintiff's and intervening plaintiffs' 1926 and 1952 contracts entered into pursuant to the Reclamation Act, 43 U.S.C. §§ 371 et seq., and the intervening defendants' contracts entered into pursuant to section 1 of the Warren Act, 43 U.S.C. § 523, preserve to the plaintiff and intervening-plaintiffs a first right to use the stored water in storage works under the Bureau of Reclamation's North Platte Project. It is further

ORDERED, ADJUDGED AND DE-CREED that the federal defendants vio-

lated the plaintiff's and intervening plaintiffs' 1926 and 1952 contracts in 1989 when defendant Bureau of Reclamation used an allocation method other than the pro rata method specified in said contracts and by including acreage other than the acreage specified in said contracts when it made a pro rata distribution of water available from the storage works of the North Platte Project.